[Crim. No. 27120. Second Dist., Div. Four. Mar. 9, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
ISAAC IKE GIBSON, Defendant and Appellant.

## COUNSEL

Richard J. Stall, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JEFFERSON (Bernard), J.**—Defendant Isaac Ike Gibson was charged by information with the murder of Donald Rufus Truelove, in violation of Penal Code section 187. He entered a plea of not guilty. Trial was by jury, and defendant was convicted of second degree murder. Probation was denied, and defendant was sentenced to imprisonment in the state prison for the term prescribed by law. He appeals from the judgment of conviction and, also, the sentence.[1]

The facts presented at trial show that on Sunday, April 28, 1974, three persons were occupying the premises at 586 East 9th Street in Pomona, California: defendant, his sometime girlfriend, Evelyn Hanson,[2] and Harry Pigg, a 57-year-old invalid confined for the most part to a wheelchair. All were part of what was termed at trial an "alcoholic subculture."

Evelyn Hanson testified that on the day in question, she and the others arose at between 8 and 9 a.m. They had been drinking the night before, and wished to continue; a search was made for funds to finance more alcohol but not enough cash could be found.

Shortly before noon, the victim, Truelove, arrived at the house by cab. According to Harry Pigg, Truelove said he had $23 and brought beer and whiskey with him. Everyone shared the beer and whiskey. Harry Pigg asked Truelove to lend him some money, and Truelove gave him $5. Defendant also asked for a loan several times, but Truelove refused to give him money. In the afternoon, Truelove pushed Harry Pigg in his wheelchair to a neighborhood liquor store, where more beer and whiskey were purchased. Truelove and Pigg then returned to the house, and the drinking continued. Defendant kept after Truelove for money, but Truelove told him he wouldn't give him a dime.

Defendant then attacked Truelove, pulling him off the living room sofa and onto the floor. Defendant kicked Truelove repeatedly in the head, according to Pigg and Hanson. Neither of the onlookers physically intervened. Hanson testified that she was "deathly afraid" of Gibson.

---

[1]No appeal may be taken from the sentence, but an appeal therefrom is treated as an appeal from the judgment of conviction. (Pen. Code, § 1237, subd. 1; *People* v. *McDonough* (1961) 198 Cal.App.2d 84 [17 Cal.Rptr. 643].)

[2]At time of trial, Evelyn Hanson had married a Robert Thomas. Throughout this opinion, however, she will be referred to as Evelyn Hanson.

Neither Hanson nor Pigg participated in the attack, which lasted about 20 minutes. Pigg asked defendant to stop, but this only enraged defendant further. When defendant finally desisted, Truelove, who was 5 feet 4 and weighed 124 pounds, was bleeding badly and called to Pigg for help. Pigg testified that he did not have enough strength to assist Truelove, and that there was no telephone in the house. Apparently, some time elapsed during which defendant was in the bathroom, Hanson was lying down and Pigg sat at the front window in his wheelchair. Subsequently, defendant went to the kitchen to prepare some food. Truelove remained in a prone position on the living room floor.

Donald Alloway, also known as "Big Bob," testified that on this particular Sunday he worked until 7:30 p.m. After stopping for a cup of coffee, he proceeded to the East 9th Street address. Upon entry, he saw Truelove's body and asked Pigg what had happened; Pigg told him, "Ike and Truelove got into it." Alloway observed defendant sweeping up some glass in the living room. Defendant spoke to him at one point, telling him that Truelove was hurt bad and that he, defendant, was in trouble. Pigg asked Alloway to call the police, which Alloway did.

Pomona Police Officers Guest and Holloway arrived at the house at 9:30 p.m. Officer Guest observed the body, and saw blood all over the premises. All the persons present, except Alloway, showed visible signs of intoxication. Officer Guest testified that he had seen defendant drunk before and, on this occasion, formed the opinion that defendant had been drinking but was still in control of his faculties. Other police arrived. Hanson, Pigg, defendant and Alloway were all arrested and taken to the police station. Search revealed that Pigg and Hanson had no cash, defendant had $3.12, and Alloway $4.95. It was observed that defendant had a deep cut on his left buttock, a cut right thumb, that his ankle was swollen and his right toenail bruised.

Investigation at the murder scene established that Truelove's pants pockets had been turned inside out and that no money was found on the body. Search revealed broken glass on the premises, and $1.80 was found in a pair of defendant's pants. Evelyn Hanson testified that, upon her release from jail the next day, she found a bloody wrinkled dollar bill beneath the bed in the bedroom she shared with defendant. Considerable blood was found in the bathroom, where defendant had gone after the attack on Truelove.

Deputy Coroner Phillips, who performed the autopsy on Truelove, gave the opinion that death was caused when Truelove strangled on blood, i.e., "aspiration of blood due to multiple traumatic injuries to the head." The victim's jaw was broken, and some of his teeth had been knocked out. There were lacerations consistent with an attack with broken glass, and also lacerations that were semi-circular in shape; corresponding to the markings that could be made by defendant's black shoes, which had half-moon clips on the heels. These lacerations had, according to Dr. Phillips, been made with a blunt instrument applied with tremendous force. Time of death was estimated at between 4 and 8 p.m. on April 28. Truelove's blood alcohol reading was .23.

Evelyn Hanson was permitted to testify, on direct examination by the prosecution, that on December 15, 1973, she had in her possession approximately $100; that defendant was present when she received this money and had asked her for money several times that day; that later that evening there had been some drinking by her and defendant. She also testified that, as she was sitting on the side of the bed in Harry Pigg's bedroom and while Harry was in bed, defendant came in and asked her for money again and that she refused to give him any money; that she had her purse on the bed; that defendant got mad and hit her on the back of the head with a crutch twice. Hanson stated that she started bleeding pretty badly and ran out of the door. An ambulance was summoned and she was taken to the hospital; eight stitches were required for the wound inflicted on her head. Evelyn also testified that, after striking her, defendant struck Harry in the face; that before she was able to get off the bed and go out the door, defendant reached around the bed, got her purse and took the money out; that the amount of money taken was approximately $40. Harry Pigg was permitted to testify in corroboration of this Hanson incident.

Evelyn Hanson was also permitted to testify that prior to the December 15, 1973, date, at the same residence, she was present with defendant, Harry Pigg and Avery Garner; that before this occasion she had seen Garner with quite a little money. She said that Garner received a monthly check of $210 which she had seen many times; that those checks constituted a trust fund; that on occasions, after cashing his check, Garner would come over to the house on 9th Street. Hanson further testified that on an occasion some time in November or December 1973, before the December 15 incident, Avery was at the house and he and defendant both had been drinking; that defendant accused Avery of having on Gibson's clothing; that Gibson completely stripped Avery of

the clothes Avery was wearing, leaving Avery nude. Hanson also testified that she didn't see defendant take any money from Avery on this occasion. Hanson testified that the clothes Avery was wearing were not Gibson's clothes but his own clothes; that defendant then realized that the clothes were not his and gave them back to Avery.

Pigg also testified with respect to the Avery Garner incident. He added that defendant had taken from under Pigg's mattress $8 that belonged to Avery but didn't touch $27 that Pigg had in the same place.

Defendant testified in his own behalf. He said that he and Truelove had been friends; he denied killing him. He testified that he had pushed Harry Pigg to the liquor store on April 28, and that when they returned to the house, Truelove was dead; that someone else had killed him. Defendant's testimony was that Alloway came to the premises and stayed all day. Defendant explained that the injury to his buttocks was caused by Evelyn Hanson, who had attacked him after he returned to the house.

The defense also offered a diminished capacity theory. When defendant's blood alcohol level was measured at 5:30 a.m. on April 29, 1974, the reading was .08. Defense experts were of the opinion that during the crucial period on April 28, defendant's blood alcohol content must have been high enough to render him drunk. Dr. Harold C. Deering, the defense psychiatrist, had tested defendant and had formed the opinion that defendant was incapable of premeditation and deliberation at the time of the commission of the offense, due to a character disorder, low intelligence, and the probable degree of intoxication; that defendant did have the mental capacity to harbor actual malice, but had only limited capacity to form the specific intent to commit robbery and kill.

The information charged defendant with murder; at trial, the prosecution's theory was that defendant had killed Truelove during the course of robbing him, thereby committing felony murder, i.e., murder in the first degree. We note that this attempt by the prosecution was proper (*In re Walker* (1974) 10 Cal.3d 764, 781 [112 Cal.Rptr. 177, 518 P.2d 1129]), as the thrust of this appeal is an attack upon the propriety of seeking a first degree murder verdict; we also note that the tactic was unsuccessful, as defendant was convicted of second degree murder.

Defendant contends on this appeal that the trial court committed prejudicial error when it admitted the evidence, in the form of testimony from Evelyn Hanson and Harry Pigg, of prior criminal

conduct of defendant. The People argue that this evidence was properly admitted because it was relevant to the issue of motive and intent as to robbery-murder under the felony-murder rule.

■ It is an established principle of evidence law that evidence of other criminal acts or misconduct of a defendant may not be admitted at trial when the sole relevancy is to show defendant's criminal propensities or bad character as a means of creating an inference that defendant committed the charged offense. (Evid. Code § 1101, subd. (a); *People* v. *Sam* (1969) 71 Cal.2d 194 [77 Cal.Rptr. 804, 454 P.2d 700].) Such other-crimes evidence has been held admissible only when it was logically relevant to some material issue in the particular prosecution other than as character-trait evidence. (*People* v. *Durham* (1969) 70 Cal.2d 171 [74 Cal.Rptr. 262, 449 P.2d 198]; *People* v. *Schader* (1969) 71 Cal.2d 761 [80 Cal.Rptr. 1, 457 P.2d 841].)

This limited principle of admissibility is predicated on Evidence Code section 1101, subdivision (b) which provides that such evidence is admissible to "prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than . . . disposition to commit such acts."

The decisional law has frequently stated that trial courts must weigh the admission of such evidence carefully in terms of whether the probative value of the evidence is greater than the potentially prejudicial effect its admission would have on the defense. (Evid. Code, § 352; *People* v. *Haston* (1968) 69 Cal.2d 233 [70 Cal.Rptr. 419, 444 P.2d 91].) ■ In the case at bench, the trial court ruled that the other-crimes evidence was admissible because of its relevance to defendant's state of mind—his intent and motive—at the time of the charged offense. But the jury was cautioned that such evidence could only be considered by them for the purpose of determining that issue—not as indicative of "criminal propensities" on defendant's part. The jury was also instructed at the close of trial in the same vein, at defendant's request.

Defendant argues that the evidence was particularly prejudicial because the prosecution presented eyewitness testimony to defendant's attack on the victim. But such eyewitness testimony did not include any assertion that defendant had robbed Truelove, the victim. Thus, Hanson testified that defendant's attack upon the victim went on for approximately 20 minutes, and that defendant then went over and sat in his

rocking chair where he had been sitting prior to the attack. Pigg also testified to seeing defendant strike Truelove with his fists and kick him.

The other-crimes evidence admitted in the instant case tended to establish that defendant committed prior criminal offenses against three victims: (1) a robbery involving injury to a female victim; (2) a battery against a crippled victim lying in bed; and (3) a battery against a third victim and a theft from this same victim.

It should be kept in mind that other-crimes evidence, relevant as circumstantial evidence to prove conduct, generally falls into two broad categories. One category is that of character trait or propensity evidence. The relevancy rationale for this category is that, through logic and experience, we accept the circumstantial-evidence-reasoning process that a person generally tends to act in conformity with his character trait. The second broad category for relevancy of such other-crimes evidence is that such evidence tends to establish a state-of-mind or state-of-emotion fact. Here, again, we accept the rationale of relevancy that one tends to act in conformity with whatever state of mind or emotion he possesses.

Evidence Code section 1101 makes the distinction in admissibility between the two categories. Section 1101, subdivision (a) makes *inadmissible* other-crimes evidence when the relevancy theory is that of character trait or propensity use of such evidence to prove that defendant committed the crime charged. On the other hand, Evidence Code section 1101, subdivision (b) makes *admissible* the other-crimes evidence when relevancy is predicated on a state-of-mind or state-of-emotion fact which, in turn, leads to an inference of the existence of that same state-of-mind fact at the time of the charged offense, or, that defendant acted in accordance with his state of mind and committed the charged offense.

Under Evidence Code section 1101, subdivision (b), however, other-crimes evidence becomes subject to exclusion in a particular case by application of Evidence Code section 352. It is obvious that there is a thin line between the employment of other-crimes evidence to establish a defendant's character trait or propensity and its use for some other purpose. The courts have recognized that, whenever other-crimes evidence is offered under Evidence Code section 1101, subdivision (b), there is always the potential for great prejudice to a defendant because of its possible misuse by the jury as character trait or propensity evidence.

Although relevant in the sense that it meets the definition of relevancy contained in Evidence Code section 210, as having a tendency in reason to prove or disprove some disputed fact, the probative value of other-crimes evidence as character trait evidence is of slight or weak value when compared with the danger of its prejudicial effect. This explains the policy that undergirds the statutory provisions against admissibility contained in Evidence Code section 1101, subdivision (a).

The same danger exists when other-crimes evidence is offered under section 1101, subdivision (b) because the jury is very apt to use such evidence to punish a defendant because he is a person of bad character, rather than focusing upon the question of what happened on the occasion of the charged offense. Thus, in *People* v. *Thornton* (1974) 11 Cal.3d 738, 756 [114 Cal.Rptr. 467, 523 P.2d 267], where other-crimes evidence was offered on the issue of identity, the court remarked that "because the prejudicial effect of such evidence is always manifest, the court's discretion should be exercised in favor of exclusion if the inference of identity is weak." A similar principle is set forth in *People* v. *Schader* (1969) 71 Cal.2d 761, 772-773 [80 Cal.Rptr. 1, 457 P.2d 841]: "We exclude such evidence of other crimes not because it lacks probative value but because its prejudicial effect outweighs its probative value. We have thus reached the conclusion that the risk of convicting the innocent by the admission of evidence of other offenses is sufficiently imminent for us to forego the slight marginal gain in punishing the guilty." (Fns. omitted.) "We have elsewhere recognized the substantial prejudicial effect inherent in evidence of prior offenses . . . ." (*People* v. *Sam* (1969) 71 Cal.2d 194, 206 [77 Cal.Rptr. 804, 454 P.2d 700].)

We recognize that even when the commission of a criminal *act* is a disputed issue, evidence of *motive* may become relevant to that issue. Motive is itself a state-of-mind or state-of-emotion fact. Motive is an idea, belief or emotion that impels or incites one to act in accordance with his state of mind or emotion. Evidence of motive, therefore, meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle one tends to act in accordance with his motive. Other-crimes evidence, admitted to prove a defendant's motive, is much closer to its use as character trait evidence than when it is offered solely to prove defendant's intent. In terms of prejudicial consequence, there is very little difference, however, between other-crimes evidence that is introduced to establish a defendant's *motive* and thence to the inference that the charged offense was committed by defendant in accordance with such motive, and other-crimes evidence as

*character trait* evidence that leads to the *same inference*—that a defendant acted in accordance with such character trait and committed the charged offense.

It is the essence of sophistry and lack of realism to think that an instruction or admonition to a jury to limit its consideration of highly prejudicial evidence to its limited relevant purpose can have any realistic effect. It is time that we face the realism of jury trials and recognize that jurors are mere mortals. Of what value are the declarations of legal principles with respect to the admissibility of other-crimes evidence such as are found in *Thornton, Schader* and *Sam,* if we permit the violation of such principles in their practical application? We live in a dream world if we believe that jurors are capable of hearing such prejudicial evidence but not applying it in an improper manner.

In the case at bench, the evidence with respect to the prior criminal acts of defendant, testified to by Hanson and Pigg, had to lead inexorably and inevitably to defendant's prejudice. The jury could not be expected to undertake the Herculean task of not using this evidence to establish that defendant committed the murder of Truelove, or that he should be found guilty anyway because he possessed character traits for violence and theft. The expectation that the jury could limit its use of such evidence as circumstantial evidence of defendant's *intent* and *motive,* after applying other evidence in the case to reject defendant's alibi defense in accordance with the court's limiting instructions and admonitions, is indeed an exercise in futility and illusory imagery.

What our Supreme Court said in *Sam* seems particularly apposite to the situation presented in the case at bench: "This case is a dramatic illustration of the prejudice that can be injected into a trial through the device of demonstrating prior criminal acts. By use of this strategem, the prosecution was able to place before the jury the largely irrelevant but manifestly harmful information that defendant was a man who often drank to excess and was frequently drunk; that he was often belligerent and fought with others; that he had been living with a married woman not his wife; that he had struck that same woman with sufficient force to hospitalize her; that he had helped to assault his good friend Tubby so severely that an ambulance and the police had to be called; that he had admitted to one assault and battery and had been charged with another. In short, defendant was made to appear to be an antisocial individual of generally bad character, an immoral person unworthy of the jury's belief or consideration. Certainly, a substantial showing of probative value was

required to justify admission of this prejudicial and inflammatory evidence so that the jury could dispassionately perform its function of ascertaining the truth as to the events involved in *this* case." (*Sam, supra,* 71 Cal.2d 194, at p. 206.) (Italics in original.)

Although Evidence Code section 352 gives the trial judge wide discretion, it is a discretion that must be exercised with discerning care in connection with the question of the admissibility of other-crimes evidence offered against a defendant, because of the inherently prejudicial nature of such evidence as constituting character trait and propensity evidence. We hold that the admission of such evidence in the case at bench constitutes an abuse of discretion. The testimony of Hanson and Pigg regarding defendant's prior criminal acts should have been excluded pursuant to Evidence Code section 352.

■ Defendant contends that the trial court erred in not instructing the jury, *sua sponte,* that witnesses Hanson and Pigg (and possibly Alloway) were accomplices, and that their testimony must be supported by sufficient corroboration. (Pen. Code, § 1111.) Defendant argues that the presence of these persons at the scene of the crime, and their failure to prevent the crime, as well as their subsequent arrest, constituted evidence that they were, in fact, accomplices.

Penal Code section 1111 defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." "A person present when a crime is committed who engages in conduct aiding and assisting the perpetrator with knowledge of the latter's criminal intent, aids and abets in its commission." (*People* v. *Herrera* (1970) 6 Cal.App.3d 846, 852 [86 Cal.Rptr. 165].) "Neither presence at the scene of a crime, nor failure to take steps to attempt to prevent a crime, establish that a person is an aider or abettor." (*Pinell* v. *Superior Court* (1965) 232 Cal.App.2d 284, 287 [42 Cal.Rptr. 676].)

The issue of the status of a witness as an accomplice may be one of fact or of law. " 'Where the facts with respect to the participation of a witness in the crime for which the accused is on trial are clear and not disputed, it is for the court to determine whether he is an accomplice. . . . Where such witness is an accomplice as a matter of law, the court should so charge. . . . Conversely, where, as a matter of law, the witness is not an accomplice, the court does not err in refusing to charge that he is or in

refusing to submit the issue to the jury.' " (*People* v. *Hoover* (1974) 12 Cal.3d 875, 880 [117 Cal.Rptr. 672, 528 P.2d 760].)

In the case at bench, there was no evidence, disputed or undisputed, that suggested that witnesses Pigg and Hanson had in any way assisted in the attack on Truelove. They denied it; defendant's testimony was simply that he was not present when the crime took place. While defendant disputed Alloway's testimony that Alloway arrived after the crime had been committed, there is nothing else in the record inferring that Alloway was a criminal participant. Under these circumstances, the holding of *Hoover* applies. The court was under no duty to give an accomplice instruction to the jury, having properly made the legal determination that the witnesses were not accomplices.

Defendant also contends that the jury was not properly instructed on the defense of diminished capacity, in that the instruction given, CALJIC No. 8.77, was improperly modified by the trial judge. One paragraph of that instruction, the 1974 Revision, was deleted and one addition was made, apparently at the request of defense counsel. We have reviewed the instruction in its entirety, and have concluded that it adequately stated the law applicable to the case. The omitted paragraph discussed the mental state required for first degree murder, and need not concern us as defendant was not convicted of that offense; the addition (italicized, *infra*) was conjunctive rather than disjunctive, but does not significantly affect the tenor of the instruction given: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, mental defect, intoxication, or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder and voluntary manslaughter. [¶] Thus, if you find that the defendant's mental capacity was diminished to the extent that you have a reasonable doubt whether he was able to form the mental states constituting either express or implied malice aforethought, you cannot find him guilty of murder of either the first or second degree. If you have a reasonable doubt whether he was able to form an intention unlawfully to kill a human being, you cannot find that he harbored express malice. Further, if you have a reasonable doubt (1) whether his acts were done for a base, antisocial purpose, or (2) whether he was aware of the duty imposed on him not to commit acts which involve the risk of grave injury or death *and had the mental capacity to conform his acts to such duty* or (3) whether he did act despite that awareness, you

cannot find that he harbored implied malice. [¶] Furthermore, if you find that as a result of mental illness, mental defect, or unconsciousness caused by voluntary intoxication, his mental capacity was diminished to the extent that he neither harbored malice aforethought nor had an intent to kill at the time the alleged crime was committed, you cannot find him guilty of either murder or voluntary manslaughter."

It appears that defendant was given the full benefit of the diminished capacity instruction as it applied to all the requisite mental states of murder and manslaughter, and we find no error.

■ Defendant contends that there was insufficient evidence of robbery to warrant the giving of felony-murder instructions to the jury. We need not consider this contention. Since defendant was found guilty of second degree murder—not murder in the first degree—error, if any, would have been nonprejudicial. (*People* v. *Williams* (1970) 10 Cal.App.3d 638, 644-645 [89 Cal.Rptr. 143].)

■ Defendant contends that the trial court failed to make inquiry into the adequacy of defendant's representation by his counsel at trial, thus depriving defendant of his constitutionally protected right to a fair trial, as required by the Sixth Amendment to the United States Constitution. Defendant relies on *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], wherein the California Supreme Court reversed a criminal conviction on the ground that the trial court had failed to make sufficient inquiry into the circumstances which had prompted defendant to complain concerning the adequacy of his representation. *Marsden*, however, reiterates that " '[a] defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused. . . .' " (*Marsden, supra*, 2 Cal.3d 118, at p. 123.) The court has discretion in the matter, and the constitutional requirement placed on it is simply to inquire sufficiently into a defendant's complaints so that it can exercise its discretion on an intelligent basis. Thus, "[a] trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request. The defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are *not apparent* to the trial judge from observations within the four corners of the courtroom." (*Id.*, at p. 123.) (Italics added.)

We turn to the record before us to ascertain whether, prior to his ruling that defendant was in fact being adequately represented, the trial judge adequately explored with defendant his complaints concerning his counsel. It appears that, during trial, the trial judge received two written communications from the defendant in which he expressed dissatisfaction with his trial counsel; he complained that his attorney had prejudged him, wanted him to plead to a lesser and included offense, and had not mentioned to the jury his desire to take a lie detector test. The trial court read the communications into the record, and discussed the situation with defendant, pointing out that the results of a lie detector test would be inadmissible. The trial court told defendant his case was being well-tried, and that at no time had his counsel made any statement showing prejudgment. The court then said: "THE COURT: Do you have any other questions at this time on that subject? [¶] DEFENDANT: Not at the present time, Your Honor."

While the jury was deliberating, defendant again communicated with the judge by delivering to him a complaint concerning witnesses that had not been subpoenaed by his counsel; the complaint had apparently been drafted by someone at the county jail, and included reference to defendant's Sixth Amendment rights. The judge reviewed the communication but suggested that defendant submit his complaints in his own handwriting, rather than employing the services of a "jailhouse lawyer." The dialogue between the judge and the defendant ended when defendant commenced statements which were inconsistent with his trial testimony, and was cautioned by the judge about self-incrimination. It appears also, from defendant's somewhat rambling oral communication to the court, that defendant wished to file an assault charge against Evelyn Hanson, and that defendant felt he had been singled out unfairly vis-a-vis other persons present at the crime scene.

*Marsden* makes it clear that a trial judge retains, within the constitutional limits of necessary inquiry, discretion as to substitution of counsel. A fair reading of the transcript reveals that defendant did not have valid, substantive grievances against his court-appointed counsel, but had widely ranging dissatisfaction with his situation in general. The record demonstrates considerable skill on the part of his trial counsel. We conclude that the trial judge adequately explored the situation, and that defendant's Sixth Amendment rights were not violated. (See also *People v. Standifer* (1974) 38 Cal.App.3d 733, 745 [113 Cal.Rptr. 653].)

■ Finally, defendant complains of the prejudicial effect of the admission into evidence of certain gruesome photographs of the

deceased, arguing that their inflammatory effect outweighed their probative value. (Evid. Code, § 352.) He particularly refers to two photographs—exhibits 1 and 7. The People claim, incorrectly, that no trial objection was made to their introduction, and thus seek to invoke the rule that an objection first made on appeal comes too late. The record, however, shows that defense counsel *did* object to their admission and that the trial court ruled adversely to the defense; hence, that ruling is subject to our review.

In the argument to the trial judge over the exclusion of the photographs, People's exhibits 1 and 7, the prosecutor represented that the photographs were relevant to illustrate the expected testimony of the coroner regarding the cause of death. Yet, when Deputy Coroner Phillips was testifying, she was asked only to identify the photograph, exhibit 1, as being a photograph of the deceased, Truelove, upon whose body an autopsy was performed. Witness Phillips was not asked to use the two photographs in explanation of her testimony as to cause of death. Many other photographs of the deceased were introduced in evidence and were used to illustrate Deputy Coroner Phillips' testimony as to the cause of death. Some of these were cumulative and gruesome in character. The trial judge was clearly misled by the prosecutor's representations regarding the People's exhibits 1 and 7, made at the beginning of the trial.

We have examined all of the photographs admitted in evidence, including the two photographs in question. The two photographs to which objection was made, are gruesome, revolting, and shocking to ordinary sensibilities. In light of the many other photographs of the deceased victim used in connection with the testimony of Deputy Coroner Phillips, exhibits 1 and 7 represented cumulative evidence of slight relevancy. Their probative value was substantially outweighed by the danger of undue prejudice to defendant.

The introduction into evidence of exhibits 1 and 7 in the case at bench is not unlike the introduction of gruesome photographs in *People* v. *Smith* (1973) 33 Cal.App.3d 51, 69 [108 Cal.Rptr. 698], in which the court remarked: "[T]here were ample descriptions of the positions and appearances of these two bodies [victims]. There was autopsy testimony regarding the precise location and nature of the wounds, which needed no clarification or amplification. . . . They supplied no more than a blatant appeal to the jury's emotions."

In the case at bench, the trial court abused its discretion under Evidence Code section 352 in admitting People's exhibits 1 and 7.

■ The concurring opinion recites that the majority opinion is "only partially true" in stating that a trial objection was made to the introduction into evidence of the two photographs, exhibits 1 and 7. The concurring opinion relies for this view on the fact that defense counsel's objection was made on the basis that these two exhibits were cumulative. But, prior to the court's ruling, defense counsel added to the cumulative objection an undue prejudice objection.

The record reflects the following: "THE COURT: Counsel wish to argue further? [¶] MR. TAYLOR: No, Your Honor. I do submit with this observation, that oral testimony can be used to describe what counsel is advocating. [¶] And the problem with pictures is that they speak, not only a thousand words, but they go back into the jury room with the jurors. And they would have to recall oral testimony, whereas the graphic displays of the gruesomeness of this particular incident will remain with them. [¶] With that, I submit it, Your Honor. [¶] THE COURT: The Court will make the finding that all of the photographs marked as People's exhibits are relevant to the issues before the Court; and that the probative value, from what has been represented by the photographs and indicated by counsel as to the use of the photographs during the course of trial, is not outweighed by any danger that might exist from the minds of the jurors being swayed by the appearance of the photographs. [¶] The Court will attempt to exercise caution in the selection of the jury so that those jurors on voir dire examination who indicate some personal repugnance from the photographs may be inquired of by the Court and by counsel before being seated as jurors. I think with that safeguard, the Court's exercise of its discretion under 352, in allowing the use of the photographs subject to their disability on other grounds, would not be unwarranted. [¶] Counsel have, I believe, agreed on a stipulation as to the exhibits which have been marked for identification, with the exception of Defendant's B, which is being held as an unused number; and I believe, also, Defendant's O, to which People feel they cannot stipulate. But with respect to all other exhibits, P-1 through 22 and D-A through N, counsel are prepared to stipulate that these exhibits may be received in evidence at this time subject to any further objections as to relevancy or materiality, but without any further foundation. [¶] MR. HAYES: I would so stipulate for the People, Your Honor. [¶] MR. TAYLOR: So stipulated, Your Honor. [¶] THE COURT: The stipulation will be received; and Exhibits P-1 through P-22 and D-A through N, with the

exception of B, an unused number, will be received per stipulation of counsel."

■ The Evidence Code does not require that an objection to proffered evidence be made in any particular form. Evidence Code section 353, subdivision (a) requires only that an objection to evidence be "timely made and so stated as to make clear the specific ground of the objection" if reversal is sought on the ground of the erroneous admission of evidence. ■ In the instant case, we think that defense counsel's objection satisfied the requirements of Evidence Code section 353, subdivision (a) for specificity. A reasonable interpretation of the objection indicates that counsel was relying on Evidence Code section 352. The record establishes that the trial judge so understood the objection and relied upon Evidence Code section 352 to overrule the objection.

Since the trial judge overruled defense counsel's objection, we do not subscribe to the view that a failure to renew the objection upon the trial judge's subsequent question as to whether there was any objection to the People's exhibits should be considered a waiver. This is especially true in the instant case since the objection to exhibits 1 and 7 were made when the exhibits under discussion were exhibits P-1 through P-22 and the trial judge made a definitive ruling as to admissibility of these exhibits "subject to any further objections as to *relevancy* or *materiality* but without any further foundation." (Italics added.) The subsequent question of the trial judge relative to objections related to exhibits 1 through 55. Under these circumstances of additional exhibits being involved, and with the question of relevancy or materiality the only ground reserved as to exhibits 1 through 22, we fail to see how it reasonably can be contended that defendant has waived his objection so that he is precluded from urging the point on appeal.

We conclude that the errors of admitting in evidence the other-crimes evidence and the two photographs are such as to require a reversal of the judgment. It is reasonably probable that a result more favorable to defendant would have been reached in the absence of these errors.

The judgment is reversed.

Kingsley, Acting P. J., concurred.

**DUNN, J.**—I concur in a reversal based upon the inadmissibility of the evidence of defendant's prior criminal acts.

However, I do not find any basis for reversal in the admission of photographic exhibits 1 and 7. Although their admittance may have been erroneous, it was not prejudicially erroneous. Exhibits 1 and 7 show the dead man lying with his eyes open, apparently in the position in which defendant left him when, leaving Pigg and Hanson in the victim's presence, defendant went into the bedroom and then into the kitchen. Photographic exhibits 8 and 4 are just as gruesome, if not more so.

There is a further reason for rejecting the photographic exhibits as being prejudicial. Thus, the majority opinion states that "The People claim, incorrectly, that no trial objection was made to their introduction . . . ." This statement is only partially true. Thus, at a hearing taking place October 17, 1974, out of the jury's presence, the trial court, conducting a pretrial review of the photographic exhibits, asked if there were any objections to exhibits 1 and 7. Defendant's counsel objected, stating the photographs were merely cumulative. The prosecutor stated that "The purpose of No. 1 would be to show the swollen jaw area. This was one of the primary causes of death. I think the coroner will testify that decedent's jaw was broken and teeth were forciably [sic] knocked out, and this was the cause of the bleeding which resulted in the decedent's death . . . . People's 1 shows merely a closeup of the swollen jaw area, indicating what the coroner will testify to be as a broken jaw. Thereafter, the trial judge ruled the exhibits to be relevant, admitted them and stated that, with respect to People's exhibits 1 through 22, counsel were prepared to stipulate such exhibits could be received in evidence, "subject to any further objections as to relevancy or materiality, but without any further foundation." Defense counsel and the prosecutor so stipulated.

After the trial began, the photographic exhibits (including 1 and 7) were offered and received. After a recess, given on defense counsel's request in order to review the exhibits, the court inquired, "Any objection to any of the People's exhibits?" and defense counsel replied "No, Your Honor."

In the face of the statements by defense counsel, the trial court well may have concluded that, if there were any initial objection to exhibits 1 and 7, the same had been waived.

Under the foregoing circumstances, I would not reverse because of any claimed prejudicial error in the admittance of photographic exhibits 1 and 7.

Respondent's petition for a hearing by the Supreme Court was denied May 19, 1976. Clark, J., was of the opinion that the petition should be granted.