Filed 5/20/16  P. v. Linares CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071356 |
| v. | (Super. Ct. No. CM033710) |
| ANTONIO MONTES LINARES, | |
| Defendant and Appellant. | |

A jury convicted defendant Antonio Montes Linares of first degree murder and found that he personally and intentionally discharged a firearm which proximately caused great bodily injury and death to Jose Sanchez.  Defendant was 19 years old at the time of the murder.  The trial court sentenced defendant to an aggregate of 50 years to life in prison.

Defendant now contends (1) the trial court erred in admitting a witness's pretrial statements under the prior consistent statement exception to the hearsay rule; (2) the trial court failed to inquire whether defendant's trial counsel had a conflict of interest in continuing to represent defendant on his new trial motion; and (3) defendant's sentence violates the principles articulated in *Miller v. Alabama* (2012) 567 U.S. __ [183 L.Ed.2d 407] (*Miller*), even though he was over the age of 18 when he killed Sanchez.

1

We asked the parties to submit supplemental briefs on whether defendant forfeited his first appellate claim. We conclude (1) defendant forfeited his first appellate contention because he did not assert that basis for objection in the trial court; (2) under the circumstances before it, the trial court had no duty to inquire further regarding a possible conflict of interest; and (3) *Miller* does not require remand.

We will affirm the judgment.

BACKGROUND

Nine-year-old Alexandria H. was playing outside, by the front window of her home, when she heard a boom. Her older brother Timothy Nunez and his friends Jose Sanchez and defendant had been hanging out inside the house. When Alexandria looked through the front window, she saw defendant shoot Sanchez with a black gun. Alexandria saw Sanchez's ear bleeding and heard him say "ow" and "stop." She also heard Nunez say "stop." Alexandria saw defendant continue to shoot Sanchez.

Hector Silva, defendant's stepbrother, was getting ready for work when he received a call from Nunez. Nunez sounded panicked and asked Silva to immediately go to Nunez's house. When Silva arrived at Nunez's house, defendant entered his car. Silva smelled the odor of bleach. Defendant told Silva, "Someone's dead; it's Pepe [Sanchez's nickname]; I can't talk about it now; I'll tell you later."

When Nunez's mother Brandy Ann Ramsey arrived home in the evening, she saw a blue pickup truck backed up to the front door of her house. Defendant got in the pickup truck and left. Ramsey smelled the odor of bleach and a lavender scented cleaning solution in her home. She saw a stain that looked like blood on the carpet, by her front door. She noticed two shower curtains from her home were missing.

Defendant returned to Nunez's house about an hour and a half after he had left. He took a shower in the downstairs bathroom. Then defendant and Nunez left the house.

Later that night, defendant asked Silva to drive him to a bridge. Defendant told Silva he placed Sanchez's body under the bridge. Defendant had burned the body.

2

Defendant went to look at the body, and he reported the body had not completely burned. Silva and defendant returned the next morning, and defendant attempted to burn Sanchez's body one more time.

Silva subsequently saw defendant and Nunez burning clothes near a bike path by defendant's apartment. Defendant and Nunez told Silva what happened to Sanchez. Defendant and Nunez said defendant pointed a gun at Sanchez and the gun fired. Defendant shot Sanchez. Sanchez tried to hide behind Nunez. Defendant tried to shoot Sanchez again and missed. But defendant "emptied the clip" when Sanchez sat down on a chair.

Two days after the shooting, police received a tip that defendant accidentally shot Sanchez in Nunez's home with a .22 caliber gun which belonged to Nunez. Acting on the information they received, police searched Nunez's house. Police found blood at three locations in the house: on the bottom of a couch located in the living room, on a polo shirt in the downstairs bedroom, and on the door jamb of the front entry door. Police found an empty box of .22 caliber ammunition, partially burned pieces of wood and drywall, what appeared to be tattoo needles, and a partially burned sponge in the fireplace.

During a subsequent search of the house, police found diluted blood stains on one of the kitchen table chairs. There was a probable bullet strike on the kitchen floor, and a .22 caliber bullet embedded in the kitchen wall, next to the dining room table. Bloodstains were also located on the carpet in the entryway, near the front door. DNA testing provided strong evidence that Sanchez was the source of the blood stains found on the couch, kitchen chair, and carpet, and that Sanchez was the primary source of the blood found on the polo shirt recovered from Nunez's house.

Detective Scott Harris questioned Ramsey before police searched her home. Ramsey denied any knowledge of a shooting. But she said defendant left as she arrived home, and she smelled the odor of a cleaning solution in her home. During a second

3

conversation with Detective Harris, Ramsey disclosed her daughter said she heard a gunshot when she was playing outside. At trial Ramsey admitted she was not honest and did not disclose everything she knew when she spoke with Detective Harris. Ramsey said she was concerned Nunez was involved, so she wanted to speak with Nunez and find out what happened before speaking with the authorities.

Police recovered three expended .22 caliber shell casings by a bike path near defendant's apartment. A criminalist later determined the shell casings were fired from the same semiautomatic firearm, but the specific type of semiautomatic firearm that was used could not be ascertained. Also by the bike path, police saw an ash pile from which they recovered a burnt zipper pull and metal eyelets, possibly from a shoe. In a nearby creek, police found a set of keys which included a key to Sanchez's home.

Silva cooperated with the police. He gave police the following account: Defendant told Silva that Sanchez was being "antagonistic" when Nunez, defendant, and Sanchez were hanging out at Nunez's house. Defendant pointed a gun at Sanchez and the gun discharged. Sanchez put his hand up to his head and said, "Holy shit, you shot me in the head." Defendant freaked out. Sanchez tried to hide behind Nunez. Defendant "emptied the clip" into Sanchez. Defendant and Nunez wrapped Sanchez's body in a shower curtain. Defendant placed the body under a bridge, and burned the body.

Sanchez's body was discovered under a bridge. The body was wrapped in a plastic material that appeared to be a tarp or a shower curtain. It appeared the body had been burned under the bridge. Most of the body was charred.

Defendant and Nunez left town after police searched Nunez's house. Police arrested defendant and Nunez in Gilroy. Nunez acknowledged there was a shooting, and that Sanchez, Nunez, and defendant were present at the shooting.

The People's expert on cause of death, Dr. Thomas Resk, opined Sanchez died as a result of multiple gunshot wounds to the head and torso. Death occurred over a period of minutes. Dr. Resk determined Sanchez's body was burned after Sanchez died.

4

Dr. Resk identified six gunshot wounds. Sanchez was shot in his right upper arm; the left side of his head, above his ear; the back of his head; the right side of his chest; the left side of his back; and his left hand. The bullet which entered the right side of Sanchez's chest perforated his right lung, and lodged in his pericardial sac. Dr. Resk opined Sanchez was alive when he received that gunshot wound and the wound to his left hand. Dr. Resk did not note any defensive wounds on Sanchez's left hand or any indication that Sanchez had been in a fight. There was nothing to indicate that Sanchez had been stabbed or cut in any significant way.

The projectiles recovered from Sanchez's body were consistent with .22 caliber bullets. It could not be determined whether the bullets were fired from the same weapon. There were over 200 models of firearms that could have fired those bullets. It also could not be determined whether the bullet found in Nunez's kitchen wall was fired from the same weapon that fired the bullets recovered from Sanchez's body. No gun was recovered in connection with this case.

Detective Ratto testified as a gang expert. His testimony explained why defendant might have killed Sanchez if defendant initially shot Sanchez by accident. Detective Ratto opined Nunez, Sanchez, and defendant were members of the Norteño criminal street gang. According to the detective, a Norteño gang member can be targeted for assault, killed, or expelled from the gang if he shot another Norteño gang member without a "green light," even if the shooting was accidental. Detective Ratto was not aware of any "green light" on Sanchez.

The jury found defendant guilty of first degree murder (Pen. Code, § 187, subd. (a)).[1] It found defendant personally and intentionally discharged a firearm which proximately caused great bodily injury and death to Sanchez. (§ 12022.53, subd. (d)).

---

[1] Undesignated statutory references are to the Penal Code.

It also found defendant personally used a deadly and dangerous weapon within the meaning of section 12022.5, subdivision (a).

The trial court sentenced defendant to 25 years to life in prison on count 1, plus a consecutive term of 25 years to life pursuant to section 12022.53, subdivision (d). The trial court imposed but stayed an additional consecutive 10-year term for the section 12022.5, subdivision (a) enhancement. Defendant's aggregate sentence was 50 years to life in prison.

## DISCUSSION

### I

Defendant contends the trial court erred in admitting part of Alexandria's pretrial interview as a prior consistent statement under Evidence Code section 791, subdivision (b). We conclude the contention is forfeited.

### A

Alexandria participated in a recorded pretrial interview. After defense counsel elicited testimony at trial that Alexandria's mother, aunt, sister and "nana" told Alexandria what to say in court, the prosecutor sought to play a portion of the audio recording to the jury to demonstrate that Alexandria's trial testimony was not a recent fabrication.

Evidence of a statement previously made by a witness is not made inadmissible by the rule against hearsay if the prior statement is consistent with the witness's testimony at the hearing and is offered in compliance with Evidence Code section 791. (Evid. Code, § 1236.) Evidence Code section 791 provides that a prior statement by a witness, which is consistent with the witness's testimony at the hearing, is admissible to support the witness's credibility if (1) the prior statement is offered after an express or implied charge has been made that the witness's testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and (2) the prior statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen.

6

Defendant's trial counsel objected to admission of the recording on the ground of relevance. He said Alexandria did not testify that anyone told her to lie. Defense counsel did not assert any other ground for objection to the evidence.

Defendant now argues the People failed to show that Alexandria made the pretrial statement before the motive to fabricate arose, that is, before Ramsey, who had motivation to lie about what happened, coached Alexandria on what to say. But in general, a defendant forfeits an appellate claim when he fails to timely object in the trial court on the specific ground raised on appeal. (Evid. Code, § 353, subd. (a); *People v. Abel* (2012) 53 Cal.4th 891, 924.) " 'What is important is that the objection [in the trial court] fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the [trial] court can make a fully informed ruling. If the [trial] court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the [trial] court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the [trial] court erred in failing to conduct an analysis it was not asked to conduct.' " (*Ibid.*)

The rule is illustrated in *People v. Dorsey* (1974) 43 Cal.App.3d 953. In that case, the prosecutor sought to have the custodian of records for the bank where the defendant kept a checking account testify about the content of the defendant's checking account records. (*Id.* at pp. 958, 960.) When the defendant objected to the testimony on hearsay grounds, the prosecutor established that the bank kept the proffered records in the ordinary course of business, the witness was the bank's custodian of records, and part of his duties was to keep the bank's records. (*Id.* at p. 960.) The defendant continued to object to the testimony on the ground that insufficient foundation had been laid for its admission under the business records exception to the rule against hearsay. (*Id.* at pp. 959-960.) The defendant did not specify how the custodian of record's testimony

7

failed to establish adequate foundation for admission under the hearsay exception until he argued on appeal that the testimony failed to show the mode and time of preparation of the bank records. (*Ibid.*) The appellate court concluded the defendant could not assert his appellate claim because he did not clearly state the particular ground raised on appeal in the trial court. (*Ibid.*) It said the requirement of specifying the ground of objection in the trial court was especially significant where, as in that case, the objection could have been easily cured by the party offering the testimony if the defendant had stated the specific reason for his objection at trial. (*Ibid.*)

Here, as defendant concedes, he did not object in the trial court on the specific ground raised on appeal. If defendant had asserted at trial that the People had not shown Alexandria made the pretrial statements before the motive for fabrication arose, the prosecutor and the trial court could have addressed that issue. Defendant's trial counsel objected on the ground of relevance, and the trial court addressed that issue only.

Unlike *People v. Brenn* (2007) 152 Cal.App.4th 166, 171, a case cited by defendant, the prosecutor in this case did not raise the particular issue defendant asserts on appeal. The other cases cited by defendant -- *People v. Gibson* (1976) 56 Cal.App.3d 119, *People v. Dowdy* (1975) 50 Cal.App.3d 180, and *People v. Williams* (1988) 44 Cal.3d 883 (*Williams*) -- are also distinguishable. Trial counsel for the defendants in *Gibson* and *Dowdy* objected to the admission of challenged evidence in a manner sufficient to alert the trial court and the prosecutor of the ground for objection raised on appeal. (*Gibson, supra*, 56 Cal.App.3d at pp. 136-137; *Dowdy, supra*, 50 Cal.App.3d at p. 187.) And in *Williams*, the prosecutor referred to uncharged crimes committed by the defendant during his opening statement. (*Williams, supra*, 44 Cal.3d at pp. 906-907 & fn. 5.) The defendant's trial counsel objected to the other crimes evidence at the trial on the ground of relevancy. (*Id.* at p. 907.) Other crimes evidence is admissible under Evidence Code section 1101, subdivision (b) when it is relevant to prove a fact other than a person's criminal disposition, such as intent, opportunity, preparation, or identity.

8

(*Id.* at p. 904.)  The California Supreme Court held that in the context of the prosecutor's opening statement, the objection by the defendant's trial counsel was sufficient to alert the trial court that admissibility must be determined under the criteria of Evidence Code section 1101, subdivision (b).  (*Id.* at pp. 904-907.)  The California Supreme Court held that the defendant preserved his Evidence Code section 1101 appellate claim.  (*Id.* at pp. 906-907.)

Here, like the defense counsel in *Williams*, defendant's trial counsel objected on the ground of relevancy at the trial.  (*Williams, supra*, 44 Cal.3d at p. 906.)  On appeal, however, defendant does not claim Alexandria's pretrial statement is not relevant to an issue in the case.  Instead, defendant contends Alexandria had a motive to fabricate at the time she made her pretrial statement.  The objection made in the trial court by defendant's trial counsel does not encompass the claim defendant makes on appeal.  Accordingly, we conclude defendant failed to preserve his appellate claim for review.  (Evid. Code, § 353, subd. (a); *People v. Dorsey, supra,* 43 Cal.App.3d at pp. 959-960.)

Defendant contends the trial court and the parties discussed all of "the key points" regarding the prior consistent statement hearsay exception.  We disagree.  Although the trial court said Alexandria's pretrial statement had relevance given the proximity between the shooting and the interview, trial counsel and the trial court did not discuss whether Ramsey or someone else coached Alexandria on what to say before Alexandria made her pretrial statements.

II

Defendant next claims the trial court failed to inquire whether defendant's trial counsel had a conflict of interest in continuing to represent defendant on his new trial motion.

The Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution guarantee a defendant the right to effective assistance of counsel.  (*People v. Bonin* (1989) 47 Cal.3d 808, 833 (*Bonin*).)  The purpose of that right

9

is to ensure that the defendant receives a fair trial. (*Id.* at 834.) Included in the right to the effective assistance of counsel is the right to representation free from conflicts of interest. (*Id.* at pp. 833-834.)

The trial court must make an inquiry into the matter when it knows, or reasonably should know, of the possibility of a conflict of interest on the part of defense counsel. (*Wood v. Georgia* (1980) 450 U.S. 261, 272 [67 L.Ed.2d 220, 230-231]; *Bonin, supra,* 47 Cal.3d at p. 836.) We examine the facts before the trial court to determine whether a duty of inquiry existed. (*Wood v. Georgia, supra,* 450 U.S. at pp. 272-274 [67 L.Ed.2d at pp. 230-231].)

Defendant says the trial court had reason to suspect that his trial counsel, Joe Vandervoort, had a conflict of interest because he and codefense counsel Geoff Dulebohn filed motions to be relieved as counsel, indicating there was a conflict of interest, and the trial court permitted Dulebohn to withdraw as defendant's counsel. Defendant claims the trial court could not determine whether Dulebohn's conflict of interest also extended to Vandervoort without inquiry.

Dulebohn filed a motion to be relieved as counsel after the jury returned its verdict but before the trial court sentenced defendant. Dulebohn sought to withdraw as defendant's counsel because "the attorney/client privilege [had] broken down" and there was "a legal and factual conflict of interest between the attorney and defendant." Vandervoort filed a nearly identical motion.

It appears Vandervoort and Dulebohn's motions to withdraw are based on Dulebohn's late reexamination of a photograph he claimed supported a different theory of how Sanchez was killed. Dulebohn said that during the trial, he began to formulate a theory that Sanchez was tortured and killed in the downstairs bathroom of Nunez's home. Dulebohn believed the wound to Sanchez's left hand was not a bullet wound, but rather the wound indicated Sanchez's left hand was staked to the bathroom floor by a V-shaped metal object. Dulebohn said that upon reexamining the evidence with greater scrutiny

during the trial, he came to believe the living room and kitchen were "dressed up" as "a decoy crime scene." According to Dulebohn, he could not prove his theory without additional investigation, and he thought "it was too late at that point." Dulebohn said that after the verdict, he used photo editing to enhance a photograph of the floor of Nunez's downstairs bathroom,[2] and the enhanced photograph showed a V shape in the bathroom floor. Dulebohn argued the enhanced photograph, along with other evidence presented at the trial (such as a V-shaped flap on Sanchez's left hand), supported his new theory.

The motions to be relieved as counsel, and defendant's motion for a new trial, do not indicate Vandervoort was responsible for the late discovery of the asserted new evidence. Dulebohn said he did not reexamine a particular photograph of the bathroom floor until after the verdict. Dulebohn did not attribute the belated scrutiny of the photograph to Vandervoort. Dulebohn said he would have sought to have a medical expert analyze the evidence had he realized the photograph of the bathroom floor supported his theory that Sanchez was tortured in the bathroom. Dulebohn did not say Vandervoort was responsible for any omission with regard to a medical expert.

Moreover, Vandervoort told the trial court he had no possible conflict of interest. Vandervoort said he filed a motion to be relieved as counsel because Dulebohn filed one, and Vandervoort believed he should withdraw as defense counsel "to be safe." Vandervoort said he changed his opinion "after discussing the situation with numerous lawyers, organizations, and [his] own personal lawyer that [he] was shielded and screened for any possible conflict for which Mr. Dulebohn withdraws." The trial court may rely on Vandervoort's representations that no possible conflict existed. (*People v.*

---

[2] The photograph upon which the enhanced image was created was available to defendant at trial. But defendant claimed in his new trial motion the enhanced photograph could not, with reasonable diligence, have been discovered and produced at trial.

11

*Lawley* (2002) 27 Cal.4th 102, 146.) Under the circumstances, the trial court had no duty to inquire because it had no reason to know or suspect Vandervoort had any conflict of interest.

The Attorney General points out that defendant agreed to Vandervoort's continued representation after the verdict. To the extent the Attorney General claims defendant waived his right to unconflicted representation, the record does not show defendant knowingly waived that right. " '[W]aivers of constitutional rights must . . . be "knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences[,]" . . . [and] must be unambiguous and "without strings." ' [Citations.] [¶] Before it accepts a waiver offered by a defendant, the trial court need not undertake any 'particular form of inquiry . . . , but, at a minimum, . . . must assure itself that (1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right.' " (*Bonin, supra*, 47 Cal.3d at p. 837.) The record does not show defendant was made aware of his right to conflict-free representation, of the possible consequences of potentially conflicted representation, and that he had discussed the potential drawbacks of such representation with counsel.

Defendant further argues that Vandervoort's less than zealous advocacy on the new trial motion indicated an undisclosed conflict. The trial court announced it had read defendant's new trial motion. The motion contained a lengthy declaration by Dulebohn. Vandervoort told the trial court the new trial motion was "well taken" and should be granted, but he would not "argue any facts."

We are not convinced Vandervoort was a less than zealous advocate in representing defendant on the new trial motion or that Vandervoort had an undisclosed conflict. Based on our review of the record, it appears Vandervoort believed the written

12

motion and the lengthy declaration by Dulebohn adequately set forth the grounds for granting a new trial, and he elected not to restate the arguments and factual assertions contained in the written motion. Vandervoort's election to submit the matter on the papers does not demonstrate he had a possible conflict of interest and did not trigger a duty to inquire on the part of the trial court.

In addition, defendant claims the trial court should have inquired whether Vandervoort had a conflict of interest which prevented him from seeking a new trial based on ineffective assistance of counsel. A motion for new trial may be based on ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) Defendant asserts he received ineffective assistance of counsel because Dulebohn and possibly Vandervoort overlooked a defense theory that Sanchez was tortured and then killed in the bathroom, and counsel failed to request a continuance of the trial to retain a medical expert to explore that theory.

To establish ineffective assistance of trial counsel, defendant must prove (1) that trial counsel's representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms, and (2) that the deficiency resulted in prejudice to the defendant. (*People v. Maury* (2003) 30 Cal.4th 342, 389; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

As we have explained, nothing before the trial court indicated Vandervoort was responsible for the belated discovery of the enhanced photograph or the failure to retain a medical expert. Because defendant fails to prove inadequate representation by Vandervoort in this regard, defendant also fails to establish the trial court breached a duty to inquire based on Vandervoort's omissions. (*People v. Mai* (2013) 57 Cal.4th 986, 1033-1035 (*Mai*) [rejecting claim that conflict of interest prevented defense counsel from asserting that the defendant was incompetent to stand trial where there was no substantial evidence of the defendant's incompetence].)

13

We also conclude defendant fails to establish his claim based on alleged inadequate representation by Dulebohn.  Nothing in the record shows Vandervoort's relationship with Dulebohn prevented Vandervoort from arguing that Dulebohn's representation was deficient.  Vandervoort could have reasonably concluded that an ineffective assistance of counsel claim lacked merit because Dulebohn presented his torture theory to the jury.  Dulebohn asked the jury to find that Sanchez was killed in the bathroom, and that defendant did not kill Sanchez.  We reject defendant's claim of ineffective assistance by Vandervoort because there is a rational explanation for Vandervoort's omission.  (*Mai, supra,* 57 Cal.4th at p. 1009.)

Unconflicted counsel could also have reasonably concluded an ineffective assistance of counsel claim against Dulebohn was unmeritorious because a different verdict was not reasonably probable.  There is no evidence Sanchez was shot in the bathroom.  There is no evidence of bloodstains found in the bathroom.  Dulebohn argued to the jury that defendant did not kill Sanchez, and that Sanchez was killed in the bathroom.  But the jury found defendant committed murder.  Defendant does not show that he could not have shot Sanchez in the kitchen area, as Alexandria testified she saw, if Sanchez had been tortured in the bathroom.

In sum, we cannot conclude the trial court knew or reasonably should have known of the possibility of a conflict of interest on the part of defense counsel Vandervoort.  Accordingly, we reject defendant's claim that under the circumstances before it, the trial court had a duty to inquire further concerning a possible conflict of interest.

III

Defendant also contends his sentence violates the principles articulated in *Miller, supra,* 567 U.S. __ [183 L.Ed.2d 407], even though he was over the age of 18 when he murdered Sanchez.

The Attorney General counters that defendant did not preserve his Eighth Amendment claim for appellate review.  We disagree.  The People asked the trial court

14

to sentence defendant to 50 years to life in prison. Defense counsel asked the trial court for leniency, and referenced the constitutional prohibition against cruel or unusual punishment.

Although defendant did not forfeit his Eighth Amendment claim, the claim fails on the merits. Defendant's Eighth Amendment claim is based on *Miller, supra,* 567 U.S. __ [183 L.Ed.2d 407], *Graham v. Florida* (2010) 560 U.S. 48 [176 L.Ed.2d 825], *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1], *People v. Gutierrez* (2014) 58 Cal.4th 1354, and *People v. Caballero* (2012) 55 Cal.4th 262. But, unlike defendant, the defendants in those cases were under the age of 18 at the time of their crimes. (*Miller, supra,* 567 U.S. at p. __ [183 L.Ed.2d at pp. 415-416]; *Graham v. Florida, supra,* 560 U.S. at pp. 53-55, 74 [176 L.Ed.2d at pp. 832-833, 845]; *Roper v. Simmons, supra,* 543 U.S. at p. 578 [161 L.Ed.2d at p. 28]; *People v. Gutierrez, supra,* 58 Cal.4th at p. 1360; *People v. Caballero, supra,* 55 Cal.4th at p. 265.)

*Miller, supra,* 567 U.S. __ [183 L.Ed.2d 407] and the other cases cited by defendant do not require us to remand this matter. (*People v. Argeta* (2012) 210 Cal.App.4th 1478, 1482 [the rationale applicable to the sentencing of juveniles in *Miller, supra,* 567 U.S. __ [183 L.Ed.2d 407], *Graham v. Florida, supra,* 560 U.S. 48 [176 L.Ed.2d 825] and *People v. Caballero, supra,* 55 Cal.4th 262 does not apply to a defendant who was over 18 years old at the time of the crime]; *People v. Abundio* (2013) 221 Cal.App.4th 1211, 1220-1221 [follows *People v. Argeta, supra,* 210 Cal.App.4th 1478].)

The United States Supreme Court recognized an argument can be made that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." (*Roper v. Simmons, supra*, 543 U.S. at p. 574 [161 L.Ed.2d at pp. 24-25].) Defendant makes a similar argument here. Nonetheless, the Supreme Court drew the line for Eighth Amendment purposes at age 18. (*Graham v. Florida, supra,* 560 U.S. at pp. 74-75 [176 L.Ed.2d at p. 845] ["[b]ecause '[t]he age of 18 is the point where society

15

draws the line for many purposes between childhood and adulthood,' those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime."]; *Roper v. Simmons, supra*, 543 U.S. at p. 574 [161 L.Ed.2d at pp. 24-25]; *People v. Gutierrez*, *supra*, 58 Cal.4th at p. 1380.)  We are bound to follow the clear line the United States Supreme Court has drawn.  (*People v. Fletcher* (1996) 13 Cal.4th 451, 469, fn. 6 [the decisions of the United States Supreme Court on questions of federal constitutional law are binding on all state courts].)

## DISPOSITION

The judgment is affirmed.


　　　　　　　　　　　　　　　　　　　　　　／S／
　　　　　　　　　　　　　　　　　　　　Mauro, J.


I concur:


　　　／S／
Raye, P. J.


16

DUARTE, J., Concurring.

Although I agree that the judgment should be affirmed, I disagree with the majority's conclusion that defense counsel's objection at trial was insufficient to preserve the appellate claim that the child witness's prior statement was improperly admitted as a prior consistent statement. The way I read the record, trial counsel preserved the claim.

Although counsel's initial objection was couched as a relevance objection, he explained the basis of his objection to the prosecutor's request to admit the child's recorded statement as "she never said anybody told her to lie." The prosecutor retorted: "I'm sure we'll be hearing in argument that this is a recently fabricated story and that she was told what to say. Being able to play a very short portion of the [recording] will demonstrate to the jury that is not the case, that she has been consistent." After the court asked a question about the recording's length, defense counsel described his objection to the child's "consistent statement" as submitted. The trial court then admitted the recording, finding it relevant "to help the trier of fact evaluate [the child's] credibility."

Given this context and surrounding discussions between the court and all counsel, I construe defense counsel's relevance objection as challenging the relevance of the child's prior consistent statement (which at that point the prosecutor had moved to admit) given that the child "never said anybody told her to lie." So the objection was to the statement's relevance (and proposed admission) *as a prior consistent statement*, given that a prior consistent statement is only admissible if there is evidence of recent fabrication. And here, defense counsel was arguing there *was no evidence* of fabrication, so the prior statement was not relevant to prove the *absence* of fabrication. It is clear to me from the record that the parties and court understood the objection to cover the statement's classification as a prior consistent statement and whether the statement at issue was properly classified, given that the defense position that there was no evidence of recent fabrication, i.e., the witness "never said anybody told her to lie." Imperfectly and inartfully expressed, perhaps, but adequately expressed in my view, given that the

1

court and the parties were familiar with the evidence and in the middle of the witness's examination.

Thus I would hold that the evidentiary claim was preserved.

Reaching the merits, I would conclude that the trial court did not abuse its discretion when it admitted the recording as a prior consistent statement. After defense counsel elicited from the child on cross examination that a number of her family members, including her mother, had "told [her] what to say today," and asked her if she always followed her mother's direction as to what to do and say, there was a suggestion of fabrication at trial such that the trial court could properly admit the recording as evidence that the child had described the relevant points in a consistent fashion on a prior occasion. Evidence Code section 791, subdivision (b) permitted the recording's admission, given that there was a "broad charge of fabrication" occurring after the statement at issue was given. (*People v. Brents* (2012) 53 Cal.4th 599, 616 [" 'Evidence Code section 791 permits the admission of a prior consistent statement when there is a charge that the testimony given is fabricated or biased, not just when a particular statement at trial is challenged' "]; see *People v. Noguera* (1992) 4 Cal.4th 599, 629 ["a prior consistent statement is admissible as long as the statement is made before the existence of any one of the motives that the opposing party expressly or impliedly suggests may have influenced the witness's testimony"].)


                                        _____/S/_____
                                        Duarte, J.


2