Filed 8/11/14  P. v. Corswell CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PAUL CORSWELL,<br><br>    Defendant and Appellant. | B244154<br><br>(Los Angeles County<br>Super. Ct. No. BA372215) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Clifford Klein, Judge.  Affirmed.

Pensanti & Associates and Louisa B. Pensanti for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Daniel C. Chang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted defendant Paul Corswell of attempted premeditated murder, possession of a firearm by a felon and assault with a semiautomatic.[1]  On appeal, he contends:  (1) failure to instruct on attempted voluntary manslaughter as a lesser included offense of attempted murder was error; (2) the prosecutor engaged in prejudicial misconduct; (3) he was denied the effective assistance of counsel; (4) the attempted premeditated murder conviction is not supported by substantial evidence; (5) the jury did not follow the instruction limiting the purposes for which they could consider the gang evidence; and (6) cumulative error.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The People's Case*

Viewed in accordance with the usual rules of appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence established defendant was 36 years old in June 2010.  He became a member of the criminal street gang known as the Eight Tray Gangster Crips (ETG) in 1987, when he was 13 years old.  Defendant's friends, Kevin Windsor, Damal Buckhalter and Markell Shallowhorn, were also members of ETG.

---

[1]    Defendant was charged by amended information with attempted premeditated murder (count 1), possession of a firearm by a felon (count 2) and assault with a semiautomatic (count 3).  (Counts 1, 2 and 3 were charged as counts 2, 4 and 8, respectively, but later renumbered.)  Various gun use, prior conviction and gang enhancements were also alleged.  A jury convicted defendant as charged and found true the gun use and gang enhancements.  In a bifurcated proceeding, the trial court found true the prior conviction allegations and denied defendant's motion to strike the "Three Strikes" law priors (Pen. Code, §§ 1170.12, subds. (a)-(d), 667, subds. (b)-(i)).  (All future undesignated statutory references are to the Penal Code.)  Defendant's new trial motion was denied.  Defendant was sentenced to 55 years to life in prison for attempted premeditated murder comprised of 30 years to life (15 years to life doubled pursuant to Three Strikes), plus a consecutive 20 years for the gun use enhancement (§ 12022.53, subd. (c)), plus a consecutive 5 years for the prior conviction enhancement (§ 667, subd. (a)(1)); concurrent sentences were imposed on the assault and possession of a firearm convictions; sentence on the assault charge was stayed pursuant to section 654.  Defendant timely appealed.

Another friend, William Chaney, was a member of the Four Tray Gangster Crips. In June 2010, ETG claimed as its territory the 1800 block of 78th Street, between Western Avenue and St. Andrews. Other gangs were also active in that area. In June 2010, Los Angeles Police Officer Sean Marioneaux and his mother lived on the north side of the 1800 block of 78th Street, in the same house in which Marioneaux had grown up. At the time, Marioneaux's cousin, Kenneth P., was staying with them.

Late in the afternoon on Friday, June 4, 2010, Marioneaux was getting ready for work by cleaning his orange Dodge Charger, which was parked in front of his home. Although dressed in civilian clothes and not armed, Marioneaux's back-up weapon, a black Smith & Wesson with an eight-magazine round, was laying in the open trunk. At about 5:45 p.m., Marioneaux noticed an eastbound white Dodge van with burgundy stripes and tinted windows stop in the middle of the street, almost parallel with the Charger. Defendant was the driver. Thinking defendant wanted to ask about the distinctive Charger (a not uncommon occurrence), Marioneaux said, "What's up?" Without responding, defendant exited the van and walked up to Marioneaux. Stopping about one and a half feet away from Marioneaux, defendant said, "What set are you from?" Looking down, Marioneaux saw a blue steel (i.e., black) semiautomatic handgun in defendant's right hand. Based on his experience, Marioneaux understood that defendant was asking Marioneaux to state his gang affiliation and surmised that defendant was about to shoot him. Unwilling to risk identifying himself as a police officer, Marioneaux gestured to defendant's gun and said, "What's that for?"[2] Defendant clenched the gun a little tighter. Marioneaux abandoned any idea of grabbing the gun when he noticed another man watching him from the front passenger seat of the van. Just then, Marioneaux's cousin, Kenneth P., pulled up. Afraid defendant would shoot him and his cousin, Marioneaux assessed his best option was to reach the Smith & Wesson in the trunk and use the car for cover. He slowly backed away from defendant and toward the Charger's open trunk, then grabbed the Smith & Wesson and dove for the grassy area

---

**2**    Marioneaux told the 911 operator that he responded, "Man, . . . I'm not anything."

on the passenger side of the Charger. As Marioneaux fell onto his right side, he heard two or three gunshots coming from where defendant had been standing. While trying to regain his balance and get in position to return fire, Marioneaux accidentally shot one round into the passenger side of the Charger. Marioneaux looked over the rear hood of the Charger and saw defendant pointing a gun at him; he fired two rounds at defendant, aiming for the "center mass" in accordance with his training. Marioneaux next saw defendant's companion get out of the van and come around toward the front of the van. Unsure whether the companion was armed, Marioneaux ducked down. As he moved toward the front of the Charger, Marioneaux heard more gunshots. When Marioneaux looked up over the front hood, he could not see defendant's companion, but he saw defendant was on the ground, with his head leaning against the van and the gun still in his hand. Marioneaux yelled, "Don't move." When defendant raised the hand holding the gun, Marioneaux fired at him twice. Ignoring Marioneaux's repeated commands to "[d]on't move" and "[s]top," defendant struggled into the van's driver's seat while still pointing his weapon towards Marioneaux. Marioneaux fired once more. After defendant got into the van and closed the door, the van went east on 78th Street, then turned right onto southbound Western Avenue.

Marioneaux tried to call 911 from his cell phone, but his hands were shaking so much that he could not enter the code to unlock it. When his mother came out of the house, Marioneaux instructed her to call 911.[3] Marioneaux placed his weapon on the driver's seat of the Charger and waited for the police to arrive.

Sergeant Herbert Cirilo recalled arriving at the scene at about 5:53 p.m. in response to an "off duty police officer need[s] help" radio call. Cirilo knew Marioneaux from a prior assignment and recognized him immediately. Marioneaux was trembling

---

[3]     Marioneaux's mother recalled she was reading in the living room between 5:30 and 5:45 p.m. Upon hearing gunshots at about 5:45 p.m., she ran out onto the front porch and saw Marioneaux, standing in the middle of the street with a gun in his hand, which was down by his side. She ran back into the house and called 911, then ran outside to give the phone to Marioneaux. As she was handing the phone to Marioneaux, she saw patrol cars turning from Western Avenue onto 78th Street.

and having apparent trouble catching his breath, but said he was not injured. Cirilo saw two bullet holes in the driver's side rear quarter panel of the Charger and another bullet hole on the passenger side; there were expended shells on the street and on the grass between the car and the sidewalk. Cirilo brought Marioneaux to the police station. A few hours later, another officer brought Marioneaux back to the scene, where he spent several hours walking through events with investigators. The walk-through was recorded.

Kenneth P.'s account of the shooting was identical to Marioneaux's in all material respects. Kenneth P. was alone in his Chevy Suburban when he drove onto westbound 78th Street at about 5:45 p.m. and saw Marioneaux cleaning the Charger. Before Kenneth P. could pull over to park in front of the Charger, a white van traveling in the opposite direction stopped in the middle of the street and blocked his way. Defendant, wearing a white T-shirt, shorts and a baseball cap, jumped out of the driver's seat and walked toward Marioneaux, stopping so close it looked like defendant was going to punch him. Marioneaux raised his arm to block defendant from coming any closer. Marioneaux touched something at defendant's waist, and then said something to defendant that Kenneth P. could not hear. Marioneaux and defendant pushed one another, and then defendant shoved Marioneaux so hard that Marioneaux fell back against the Charger.

As Marioneaux turned and stumbled toward the back of the Charger, defendant pulled a gun from his waistband and fired two shots at Marioneaux. Marioneaux grabbed a gun out of the Charger's trunk and dove to the other side of the car. After defendant fired at Marioneaux a third time, Marioneaux popped up from behind the Charger and fired twice at defendant, then ducked back down. Marioneaux next moved to the front of the Charger and fired once more at defendant. Defendant grabbed his side with his right hand, and fell slowly to the ground. Defendant continued firing towards Marioneaux as he was falling. When he was on the ground, defendant appeared to be looking under the Charger for Marioneaux's location. Kenneth P. saw another man get out of the passenger side of the van, lean on the front of the van and appear to be looking for something on the

5

ground.  Afraid the second man was armed and would start shooting, Kenneth P. ducked down.  When Kenneth P. looked up moments later, he saw the second man had returned to the passenger seat and defendant was struggling to get into the driver's seat.  Kenneth P. backed his car up, out of the path of the van, which drove past him.  Kenneth P. could not recall whether he identified anyone from photographs shown to him by the police the next day.

Defendant arrived in the van at the emergency entrance of Centinela Hospital in Inglewood accompanied by William Chaney and Markell Shallowhorn.  A video of their arrival taken by hospital security cameras was played for the jury.  Chaney is seen wearing a black shirt and getting out of the driver's door of the van; Shallowhorn is seen wearing a yellow shirt and getting out on the passenger side; defendant is removed from the van on a stretcher.

At about 6:00 p.m., defendant's van was found parked near Centinela Hospital.  Inside the van, police found a tooth and some tooth fragments; two baseball caps, each decorated with a different colored "T"; and a binder containing about 50 pages of rap lyrics.  Defendant's wife's SUV was found in the Centinela Hospital parking lot.  Police found a pair of shorts, the shirts Chaney and Shallowhorn were wearing in the video, and a belt inscribed:  "83 Sad Face 43."[4]  The clothing was blood stained, but there were no bullet holes.

Officers searching defendant's apartment the next day found a handgun holster and two paper shooting targets (one with numerous bullet holes) in a closet in the master bedroom.  On the nightstand, they found 10 baseball caps; each decorated with the letter "T" in a different color.  In a drawer of the same nightstand, they found four photographs; in one of the photographs, defendant is accompanied by others wearing similar baseball caps.  Two handwritten poems containing numerous gang and firearm references were found in the same drawer.

---

**4**     A gang expert testified that defendant used the moniker "Tiny Sad Face."

The parties stipulated defendant's DNA was on the front of the van. A criminalist testified defendant's DNA was also on a Bluetooth device that was handed to Marioneaux by a bystander while he was waiting for the police to arrive, in the blood in the street at the scene of the shooting and in the blood on the partial tooth found in the white van. Neither Chaney's nor Shallowhorn's DNA was found on any of those items. Damal Buckhalter's keys were found in the street at the scene. Another criminalist determined four bullets struck the driver's side of the Charger. Expended cartridges found at the scene, including inside the Charger, were determined to have come from a Glock. When interviewed at the hospital on June 7, 2010, defendant told officers he shoots a Glock at the LAX shooting range.

A gang expert estimated ETG has between 350 and 400 active members, not including incarcerated members. The primary activities of ETG include vandalism, theft-related crimes, rape, kidnapping, narcotics-related crimes, gun possession, assault and murder. The expert had encountered defendant in 2009 at St. Andrews Park, a location where ETG's members are known to congregate. In 2010, the expert encountered defendant and Buckhalter together. The expert explained if an ETG member sees another Black male in ETG territory, the ETG member will challenge the person. It is not unusual for gang members to lead apparently normal lives while also remaining committed to the gang.

B.    *The Defense Case*

Defendant testified he joined ETG as a 13-year-old in 1987. Following a 1995 robbery conviction, for which he served a prison term, defendant turned his life around. Although he was still friends with members of his former gang, defendant had not been active in ETG since getting out of prison. Defendant obtained most of his gang-related tattoos after the 1994 robbery and was in the process of having them removed or

7

modified. In June 2010, defendant was employed as a film editor and lived in Inglewood with his wife and three sons, who ranged in age from 16 years to a few months old.[5]

Defendant recalled meeting Windsor at a donut shop the morning of the shooting. After running some errands, defendant arrived at Buckhalter's home at about noon. From then until about 4:00 p.m., defendant and Buckhalter sat on Buckhalter's front porch drinking three or four beers each. When defendant left at about 4:00 p.m., he felt "buzzed" but not drunk. On his way home, defendant saw Lamont (also known as "L-Dog"), a childhood friend defendant had not seen in more than 20 years, at a bus stop on 83rd Street and Normandie. After chatting with Lamont for awhile, defendant agreed to give him a ride to a medical marijuana clinic on 73rd and Western. At the clinic, defendant waited in the car while Lamont went in. When Lamont came out about five minutes later, they agreed to have a beer together. Although there were some beers in an ice chest in the van, defendant drove toward a market on 80th Street and Western to buy more beer. To avoid traffic, defendant turned from St. Andrews onto 78th Street. On 78th Street, defendant noticed Marioneaux standing next to an orange Charger. Defendant thought Marioneaux looked familiar. Defendant gave Marioneaux a "thumbs up" sign, signaling his appreciation of the Charger's paint job. Marioneaux did not say anything, but made a gesture with his head and shoulders that defendant interpreted to mean, "What's up?"

Intending to ask Marioneaux the name of the Charger's paint color, defendant got out of the van and walked up to Marioneaux. When he got close, Marioneaux pushed defendant, to which defendant responded by shoving Marioneaux back even harder. Marioneaux then ran around the Charger. Bewildered by Marioneaux's actions, defendant walked back to the van intending to leave. Defendant's hand was on the steering wheel and his foot was on the floorboard when he heard a gunshot and realized he had been shot in the side. Defendant said to Lamont, who was still in the van's front

---

**5** In 2005, defendant's gross earnings were $94,000; in 2008, his gross earnings were $88,000.

8

passenger seat, "Son of bitch just shot me." Before defendant could turn his head, he was shot in the jaw. The shot knocked out his back teeth and rendered him momentarily unconscious. When defendant woke up, he was on the ground, leaning back against the van, and he could not move his left leg. Lamont was trying to help defendant up but when defendant saw a gun in Lamont's hand, he thought Lamont was trying to shoot him. As defendant was pulling himself into the driver's seat of the van, he saw a gun lying on that seat, which looked like the gun Lamont had been holding. When defendant pushed the gun out of the way, it felt warm. Defendant never saw that gun again.

Despite having been shot twice, defendant drove the van back to Buckalter's home where he saw Chaney and Shallowhorn walking down the street. After defendant told them he had been shot, they got him into the back of the van where he passed out just as Chaney started driving. Defendant woke up at Centinela Hospital. Defendant did not know what happened to Lamont, and had not seen him since the day of the shooting. Defendant gave his attorney the contact information he had for Lamont (which was more than two decades old) but the defense had been unable to locate him. Defendant did not say to Marioneaux, "Where you from?" or "What set are you from?" Defendant was not armed and did not shoot at Marioneaux. Defendant never saw Marioneaux or Lamont firing a gun, and did not see who shot him. Defendant was a member of the LAX Firing Range, but did not own a gun. The shooting targets found at his home came from the gun range; the holster was something he found at another gun range. Defendant could not explain why Buckhalter's keys were found at the scene of the shooting; he hypothesized Buckhalter may have dropped his keys in the van when they went to buy beer earlier in the afternoon. The "Sad Face" belt found in his wife's SUV belonged to Windsor, the friend defendant met at the donut shop the morning of the shooting. Defendant did not know how the belt came to be in his wife's car.

To impeach defendant, the People introduced excerpts of statements defendant made to police on June 7, 2010, while he was in the ICU. Before the interview, defendant was advised of and waived his *Miranda* rights. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) Although being medicated for pain relief, defendant was

9

coherent. During the interview, defendant once complained his stomach hurt. Although defendant testified Windsor called him that morning, defendant told police he called Windsor and arranged the donut shop meeting. From the donut shop, defendant went to get his hair cut, but he was too early so he got his car washed on Manchester and St. Andrews. Defendant was driving around, killing time, when he picked up four young men he saw walking down Normandie and gave them each a ride home because a recent spate of shootings in the area made walking unsafe. Defendant next picked up Chaney at his girlfriend's house on the East Side. Defendant was driving down Normandie on the way to a cigarette shop when he saw Lamont at a laundromat on 83rd Street. Defendant, Chaney and Lamont went across the street from the laundromat to get some beers. While they were drinking and relaxing, Shallowhorn walked up and joined them. After awhile, defendant agreed to take Lamont to pick up something on 73rd Street. Defendant and Lamont left Chaney and Shallowhorn drinking together. Defendant told police Lamont never got out of the van, but shot at Marioneaux from inside the van. Defendant attributed the discrepancies between his trial testimony and what he told the police while he was at the hospital to confusion caused by the pain and pain medication.

C.  *The People's Rebuttal*

Despite an extensive investigation, police were unable to find "Lamont."

**DISCUSSION**

A.  *The Evidence Did Not Warrant Instruction on Attempted Voluntary Manslaughter as a Lesser Included Offense of Attempted Murder*

Defendant contends the trial court erred in not instructing on attempted voluntary manslaughter as a lesser included offense of attempted premeditated murder. He argues that a heat of passion theory of manslaughter was supported by evidence that "prior to shots being fired, there was physical contact between [defendant] and Marioneaux when they pushed and shoved each other." Defendant is incorrect.

10

The trial court has a sua sponte duty to instruct on all general principles of law, but it is not obligated to instruct on any lesser offense unless there is substantial evidence to support such instruction. "This substantial evidence requirement is not satisfied by ' "any evidence . . . no matter how weak," ' but rather by evidence from which a jury composed of reasonable persons could conclude 'that the lesser offense, but not the greater, was committed.' [Citation.] 'On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 704-705.)

"Generally, when a defendant completely denies complicity in the charged crime, there is no error in failing to instruct on a lesser included offense. [Citation.]" (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 709 (*Gutierrez*).) But where the lesser included offense can be inferred from other circumstantial evidence, the trial court must instruct on the lesser offense even if it is inconsistent with the defendant's theory of defense. (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1016-1017 (*Sinclair*).)

Attempted voluntary manslaughter is a lesser included offense of murder, lacking only the element of malice. (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241-1242.) It is defined as an unlawful killing "upon a sudden quarrel or heat of passion." (§ 192, subd. (a).) Our Supreme Court recently explained, "An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an " 'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.' " [Citations.]' [Citation.] 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation . . . must be affirmatively demonstrated.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 813; see *People v. Moye* (2009) 47 Cal.4th 537, 550 [the provocative conduct "must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]"].) While sufficiently provocative conduct satisfies the objective element of heat of passion voluntary manslaughter, the

subjective element is satisfied by evidence that the accused killed "while under 'the actual influence of a strong passion' induced by such provocation. [Citation.]" (*Moye, supra*, at p. 550.) In *Sinclair*, *supra*, 64 Cal.App.4th at pages 1016 through 1020, the court held that no voluntary manslaughter instruction was warranted because neither the subjective nor objective elements were satisfied where the defendant denied being the perpetrator and there was no circumstantial evidence of provocation. In *People v. Najera* (2006) 138 Cal.App.4th 212, 226 (*Najera*), the court held the objective element was not satisfied by evidence that the victim pushed the defendant and called him a derogatory name because such conduct would not cause an ordinary person to lose reason and judgment.

Here, neither side requested instruction on attempted voluntary manslaughter as a lesser included offense of attempted murder. In response to the trial court's inquiry, defense counsel stated he was unsure whether the shoving match that preceded the shooting was sufficient to constitute a "sudden quarrel." After the prosecutor stated he had no objection to the instruction, defense counsel asked that it be given. The trial court concluded that to the extent there was any provocation, it was too slight to warrant the instruction. As we shall explain, the trial court was correct.

First, as defendant denied shooting at Marioneaux and affirmatively suggested Lamont was the shooter, the instruction was not warranted under *Gutierrez*, *supra*, 112 Cal.App.4th at page 709 and *Sinclair*, *supra*, 64 Cal.App.4th at page 1016. Second, under *Najera*, *supra*, 138 Cal.App.4th at page 226, evidence that Marioneaux pushed defendant was insufficient provocation to reduce an attempted murder charge to attempted voluntary manslaughter. Accordingly, the trial court did not err in refusing to instruct on attempted voluntary manslaughter.

B.    *There Was No Prosecutorial Misconduct*

Defendant contends it was prejudicial misconduct for the prosecutor to ask defendant: (1) whether he ever professed to be a Muslim and (2) what steps the defense

12

team had taken to locate Lamont. Although there was no defense objection to either series of questions, defendant argues none was necessary because the prosecutor's comments were so "reprehensible" that the harm could not have been obviated by a curative instruction. We disagree.

" 'A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact.' [Citation.] A defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion. [Citation.]" (*People v. Duff* (2014) 58 Cal.4th 527, 568.) Generally, failure to timely object and request an admonition constitutes a forfeiture of a prosecutorial misconduct claim. (*People v. Brown* (2003) 31 Cal.4th 518, 553.) There is no forfeiture where the objection or the request for an admonition would have been futile or the admonition would have been insufficient to cure the harm occasioned by the misconduct. (*People v. Panah* (2005) 35 Cal.4th 395, 462.) Even assuming defendant has not forfeited the issue, we find no prosecutorial misconduct in this case.

### 1.    Defendant's Religious Beliefs

Evidence of a witness's religious beliefs (or lack thereof) is inadmissible to prove credibility. (Evid. Code, § 789.) Although inquiry into religious beliefs ought to be viewed with caution, such evidence may be admissible if relevant to prove something other than credibility. In *People v. King* (2010) 183 Cal.App.4th 1281 (*King*), for example, a police officer was convicted of sexual battery by threat of arrest or incarceration. On appeal, he challenged admission of the victim's testimony that her Filipino and Catholic culture and religious background caused her to listen to authority. (*Id.* at p. 1311-1312.) The appellate court concluded the evidence was admissible because it was relevant on the issues of consent and duress. (*Id.* at p. 1312.)

Here, to impeach defendant's claim that he was no longer involved in any gang-related activity, the People sought to use the binder of rap lyrics found in the van to prove

13

that defendant was writing gang-themed rap lyrics up to the present time. But some of those lyrics referred to the composer as "Kalik" and to "Allah." To establish that defendant was the actual author of those lyrics, the prosecutor engaged in the following colloquy without objection:

> "[THE PROSECUTOR]: [W]hen you went to prison, did you call yourself by a different name at all? [¶] [DEFENDANT]: What do you mean? [¶] [THE PROSECUTOR]: A Muslim name of any type? [¶] [DEFENDANT]: Kalik. [¶] [THE PROSECUTOR]: Kalik? [¶] Did you have some form of religious transformation when you were in prison? [¶] [DEFENDANT]: I'm a Christian. [¶] [THE PROSECUTOR]: Did you ever profess to be a Muslim, in writing at least? [¶] [DEFENDANT]: I mean, yeah, I studied it before. [¶] [THE PROSECUTOR]: Have you ever professed to be a Muslim? That's not a bad thing if you did. I'm just asking. [¶] [DEFENDANT]: I don't knock the religion. It just wasn't for me. I tried to -- I tried a bunch of different religions. Buddhism."

While the religion of a defendant or witness is rarely relevant (and in many instances may be more prejudicial than probative under Evid. Code, § 352), the challenged questions in this case were both relevant and more probative than prejudicial on the material issue of whether defendant was still involved in gang-related activities. Under *King*, *supra*, such evidence was admissible and therefore the challenged questions did not constitute prosecutorial misconduct.

### 2. Defense Efforts to Locate Lamont

It is not improper for a prosecutor to comment on the defendant's failure to call logical witnesses to corroborate the defense case. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275; *People v. Stevens* (2007) 41 Cal.4th 182, 210.) Here, Lamont was a logical witness and the challenged questions were reasonably designed to highlight the defense's failure to call Lamont.

## C. *Defendant Was Not Denied the Effective Assistance of Counsel*

Defendant contends he was denied the effective assistance of counsel. He argues that defense counsel was ineffective in that he failed to: (1) move to suppress (or exclude

14

pursuant to Evid. Code, § 352) evidence of the statements defendant made to police while in the ICU;  (2) object to any of the gang evidence;  (3) properly investigate, including failing to locate and subpoena witnesses Lamont and Channel J.; and (4) pursue a negotiated disposition.  As we shall explain, the record does not support these arguments, which may be more appropriately addressed in a petition for habeas corpus.  (See *People v. Avena* (1996) 13 Cal.4th 394, 419 [" 'Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance [of counsel] is more appropriately made in a petition for habeas corpus.' [Citations.]".)

To establish ineffective assistance, the defendant must show:  (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) it is reasonably probable that the verdict would have been more favorable absent counsel's error.  " 'If the record does not shed light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for and failed to provide a satisfactory explanation, or there simply can be no satisfactory explanation.' [Citation.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1052-1053 (*Hernandez*).)  In the absence of a sound legal basis for objection, counsel's failure to object to the admission of evidence cannot establish ineffective assistance of counsel.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 (*Cudjo*); *People v. Zavala* (2008) 168 Cal.App.4th 772, 780 [no ineffective assistance of counsel for failure to make a futile confrontation clause objection].)

### 1. Statements Defendant Made While in the ICU

Defendant contends trial counsel was ineffective in failing to move to suppress evidence of statements he made to police on June 7, 2010, while he was in the ICU and under the influence of pain medications.  Defendant argues his *Miranda* waiver could not have been voluntary under such circumstances.  We disagree.

"To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary. [Citations.]" (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375.)  Whether a *Miranda*

15

waiver was knowing and voluntary depends on the totality of the circumstances. (*People v. Cruz* (2008) 44 Cal.4th 636, 668.) In *People v. Breaux* (1991) 1 Cal.4th 281, 301, the court concluded the defendant voluntarily waived *Miranda* rights after hospital staff administered a morphine injection where he "appeared to understand the questions, he was responsive, and his answers were prompt, detailed, and pertinent."

Here, the one-hour and twenty-minute ICU interview was recorded and the recording was transcribed. If anything in that recording suggested defendant was too medicated to understand and waive his *Miranda* rights, or did not understand the questions police were asking him, defendant could have introduced the recording in support of his new trial motion. That he did not suggests that the recording would not have been helpful.[6] Inasmuch as defendant has not shown circumstances which would have supported suppression of his statement to police, he has failed to show that trial counsel was ineffective in failing to make such a motion. (See *Cudjo, supra*, 6 Cal.4th at p. 616.) Under the same analysis, we find no merit in defendant's alternative argument that counsel should have objected to the evidence under Evidence Code section 352. The discrepancies between defendant's statement to police and his trial testimony were highly relevant impeachment evidence.

### 2. Gang Evidence

"Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*Hernandez, supra*, 33 Cal.4th at pp. 1049-1050.) Here, the gang evidence was admissible to prove motive and specific intent, as well as the gang enhancements. Since there was no legal basis to exclude the gang evidence on relevance grounds, defense counsel was not ineffective in failing to make such an objection. (See *Cudjo,*

---

[6] We denied defendant's motion to augment the record with the transcript of the interview.

*supra*, 6 Cal.4th at p. 616.) Nor has defendant pointed to any specific gang evidence that was more prejudicial than probative. On this record, defendant has failed to show ineffective assistance of counsel arising from the failure to object to the gang evidence.

### 3. Witness Channel J.

Following the jury verdict, defendant replaced his privately retained trial attorney with other another privately retained attorney. After a number of continuances, the new attorney moved for a new trial on the grounds, among others, that trial counsel was ineffective in failing to call Channel J. as a witness, and failing to locate and call Lamont as a witness. Regarding Channel J., the motion stated that Channel J. told detectives it was the van's passenger, not the driver, who asked Marioneaux what set he was from. The motion did not include an affidavit from trial counsel explaining his reasons for not calling Channel J., nor one from Channel J. attesting to what she would have testified if called as a witness. Although the motion refers to the police report chronicling Channel J.'s statement as an attached exhibit, the report is not included in the clerk's transcript. In their opposition to the new trial motion, the People point out that there were inconsistencies in Channel J.'s statement to police and she did not see the actual shooting. They conclude, "Reasonably, the totality of this scenario would have caused most experienced defense attorneys to conclude that [Channel J.'s] value as a witness was questionable at best. In fact, [Channel J.'s] testimony would have likely provided additional evidence of the defendant's guilt on issues such as motive, intent, premeditation and deliberation." Following a hearing at which no evidence was presented, the motion was denied.

Defendant has failed to establish ineffective assistance of counsel arising from the failure to call Channel J. as a witness. The record sheds no light on why counsel did not call Channel J. and there is no showing that trial counsel was asked for but failed to provide a satisfactory explanation. The decision may have reflected a reasonable conclusion that she would not have been a beneficial witness. On this record, we reject

defendant's ineffective assistance claim. (See *Hernandez, supra*, 33 Cal.4th at pp. 1052-1053.)

### 4.     Witness Lamont

Failure to conduct an adequate investigation can constitute ineffective assistance of counsel. (*People v. Jones* (2010) 186 Cal.App.4th 216, 237-239.) But the mere fact that trial counsel did not locate Lamont does not establish that trial counsel was ineffective in this case. This is because defendant has not shown that Lamont could have been located with due diligence. The People took the position that "Lamont" was a figment of defendant's imagination and that Damal Buckhalter was the passenger in defendant's van that afternoon. This theory was supported by the evidence that the police were unable to locate "Lamont" and the discovery of Buckhalter's keys at the scene of the shooting. The new trial motion did not include declarations from either trial counsel or the defense investigator explaining what steps were taken to locate Lamont. Further, substituted counsel did not include a declaration indicating that she had had been able to find Lamont in the nine months between the verdict and the hearing on the new trial motion. Absent a showing that Lamont could have been located by trial counsel, defendant has failed to establish that trial counsel was ineffective.

### 5.     Failure to Obtain a Plea Bargain

Defense counsel's "duty of investigation and research on behalf of a criminal defendant includes the duty to investigate and pursue possible dispositions by way of plea." (*People v. Brown* (1986) 177 Cal.App.3d 537, 549.) "The nature and extent of the duty imposed on counsel will, of course, vary with the facts and circumstances of each case. At a minimum, however, we conclude that the duty includes the obligation to initiate plea negotiations where the facts and circumstances of the offense and its proof, as well as an assessment of available factual and legal defenses, would lead a reasonably competent counsel to believe that there is a reasonable possibility of a result favorable to the accused through the process of plea negotiations. [Citation.]" (*Ibid*.)

In this case, the trial court discussed with defendant efforts to reach a negotiated disposition before the trial began:

> "THE COURT:  Mr. Corswell, there are cases where defendants have said at the end of the case, 'I was never told what the plea bargain was' – or 'plea agreement,' the D.A.'s offer.  So I like to put on the record what the offer is and that you're formally refusing it.  Your lawyer can speak for your refusal.  [¶] What was the offer, in general?  I don't know how specific you got.  [¶]  [THE PROSECUTOR]:  We never got specific, Your Honor.  [¶]  THE COURT:  Oh, okay.  [¶]  [DEFENSE COUNSEL]:  I would say generally, in speaking with [the prosecutor], he gave me a couple of alternates.  One of them was a straight life sentence, and the alternative was he wanted me to talk with my client regarding a number that he said would have to be somewhere at least in the mid 20's.  [¶] THE COURT:  You don't want that; right?  You're turning that down?  [¶]  THE DEFENDANT:  Of course not.  [¶]  THE COURT:  'No' is fine.  All right.  I just wanted to put that on the record."

This record demonstrates defendant was accurately informed of the offer made by the prosecution and that he rejected it.  There is nothing to suggest that defendant did not understand the offer or wanted additional time to discuss it with his attorney.  On this record, defendant has failed to establish ineffective assistance of counsel arising from trial counsel's failure to obtain a negotiated plea.

D.    *Sufficiency of the Evidence*

Defendant summarily contends the attempted premeditated murder conviction is not supported by substantial evidence.  Because defendant cites no legal authority in support of his contention, we deem the point waived.  (See *People v. Jacobs* (2013) 220 Cal.App.4th 67, 76 [" ' "[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.  [Citations.]" [Citations.]' [Citation.]"].)

E.    *The Limiting Instruction on Gang Evidence*

Defendant does not challenge the instruction limiting the purpose for which the jury could consider gang evidence which the trial court gave.  He simply contends it is unrealistic to believe that any jury could follow such an instruction.  While recognizing the general rule that jurors are presumed to follow trial court admonitions (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302-1303), and that it is impossible to know what the jurors were thinking in this case, defendant contends the judgment should be reversed because the jury may have misused the gang evidence.  To state defendant's argument is to refute it.  Having failed to point to anything in the record tending to show that the jury in fact considered the gang evidence for an improper purpose, defendant's contention is nothing but speculation that does not warrant reversal.

Defendant's reliance on *People v. Gibson* (1976) 56 Cal.App.3d 119, 130 (other crimes evidence was improperly admitted) and *Bruton v. United States* (1968) 391 U.S. 123, 129 (codefendant's confession inculpating defendant was improperly admitted at joint trial) for a contrary result is misplaced.  Those cases involved admonitions to not consider evidence which was improperly admitted.  As we have already discussed, there was no error in admitting gang evidence in this case.

F.    *Cumulative Error*

Having found no error, we necessarily find no cumulative error.

**DISPOSITION**

The judgment is affirmed.

RUBIN, Acting P. J.

WE CONCUR:

FLIER, J.                    GRIMES, J.

20