Filed 10/6/22  P. v. Amaral CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049476 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. 20CR03043) |
| v. | |
| ALBARO MONTALVO AMARAL, | |
| Defendant and Appellant. | |

A jury convicted Albaro Montalvo Amaral of offenses including murder, attempted murder, and carjacking after he fatally shot a fellow Sureño gang member and fired at two other witnesses.  He was sentenced to a total indeterminate term in prison of 100 years to life and a determinate term of 27 years 4 months.  Amaral argues that the trial court erred by admitting two bloody photographs depicting one of the victim's injuries on the day of the crime in violation of Evidence Code section 352 and by imposing multiple punishments for his convictions for murder and carjacking in violation of Penal Code section 654.[1]  He further argues that the abstract of judgment must be corrected to reflect that the trial court stayed the sentences imposed for counts 5 and 6.  Because we agree with the parties that the trial court erred in imposing sentences for both

---

[1] Unspecified statutory references are to the Penal Code.

murder and carjacking, we reverse the judgment and remand the matter solely for resentencing.

## I.    BACKGROUND

### A.    *The Information*

On June 8, 2021, the Santa Cruz County District Attorney filed an information charging Amaral with murder (§ 187, subd. (a); count 1),  attempted willful, deliberate, premeditated murder as to victim T. (§§ 664, 187, subd. (a); counts 2), attempted murder as to victim C. (§§ 664, 187, subd (a); count 3), carjacking (§ 215, subd. (a); count 4), possession of a firearm by a felon (§ 29800, subd. (a)(1); count 5), and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 6).  As to counts 1 and 2, it was alleged that Amaral personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)), and as to count 3, it was alleged that Amaral personally used a firearm (§ 12022.53, subd. (b)).  The information further alleged that Amaral had two prior strike convictions (§ 667, subd. (b)-(i)) and had two prior serious felony convictions (§ 667, subd. (a)(1)).

### B.    *The Trial*

#### 1.    *The Charged Crimes*

A member of Komar Vargas Trece, a Sureño criminal street gang, Kevin Medina-Lopez confided to his friend, T., that he was concerned about his standing in the gang:  some members wanted him removed because he was being accused of "putting something in [a woman's] drink" at a party.

A week later, on June 14, 2020, Medina-Lopez drove T. to Santa Cruz in a newer model gray sedan.  T. was meeting C. there:  the two women had met three months earlier while housed together in the same correctional facility, and T. wanted C. to help sort through boxes of mail that T. had stolen.

2

Medina-Lopez left T. with C. but later returned, this time with Amaral. Medina-Lopez then drove the group around Santa Cruz, stopping at several stores where C. and T. shoplifted. Amaral was quiet during much of the car ride and did not join the group's general conviviality, drinking, or drug use.

Medina-Lopez eventually drove the group north on Highway 17 toward San Jose, exiting on Laurel Road. He stopped the car occasionally to let C. and T. try to open mailboxes. At one set of mailboxes, C. got out of the car, and T. looked at Amaral in the backseat and asked if he was okay: Amaral looked "confused, mad." Amaral had something in his hands, at waist level. As T. resumed talking to Medina-Lopez, she heard gunshots, and everything momentarily went black. T. later realized that Amaral was shooting at her and Medina-Lopez from the backseat.

Amaral got out of the car and tried to shoot again at T. When the gun failed to fire, he started reloading and tried to open T.'s car door. T. dove out of the car and into a ditch to hide. T. could feel that she had been shot in the face.

Medina-Lopez was slumped over, apparently dead. Amaral approached C., who held up her hands and said she did not know T. or Medina-Lopez. Out of ammunition, Amaral reached into the car for a shotgun C. had seen earlier on the driver's side of the center console. C. dove into a bush and heard another gunshot.

When T. heard the car leave, she emerged and found Medina-Lopez on the ground. C. emerged after hearing T. scream her name. T. was in a lot of pain and lost consciousness twice. C. applied pressure to T.'s facial wound in an attempt to stop the bleeding. T. also had what looked like a bullet embedded in her hand.

As C. and T. left the scene on foot, a family stopped and gave them a ride to a location near Highway 17.

C. and T. both called friends for help, but they did not call 911. C. was afraid that she would be found in violation of her parole; T., affiliated with another Sureño subset,

feared repercussions for cooperating with the police. Instead, they went to a nearby house and asked the homeowner to report to 911 that their friend had been killed. C. and T. hid in the bushes on hearing sirens pass by. They came out of hiding when T.'s friend arrived to pick them up. T.'s friend wanted to drive her to the hospital, but T. refused.

Surveillance footage obtained from a neighbor who lived on Laurel Road showed that at 7:59 p.m., a gray sedan pulled up to some mailboxes. About 25 seconds later, the car drove off. At 8:03 p.m., the surveillance audio reflected a loud bag consistent with a shotgun, followed by another loud bang 10 seconds later. About three minutes later, the gray sedan could be seen returning toward Highway 17.

When officers arrived at the scene of the crime, they found Medina-Lopez lying dead on the ground on the shoulder of the road. The coroner determined that Medina Lopez had died from gunshot wounds to the head and chest.

### 2. *The Aftermath of the Crime and the Police Investigation*

The day after Medina-Lopez's murder, an employee was working at his office in Scotts Valley when he saw a man standing next to a parked car holding a backpack that was starting to catch on fire. The employee told the man he was going to get a fire extinguisher, and the man appeared evasive. When the employee returned with the fire extinguisher, the car was fully aflame, and the man with the backpack was nowhere to be seen.

By the time the fire was extinguished, the car, a 2017 silver Nissan Sentra, was heavily burned.[2] Inside the car was a partially melted purse that contained a variety of mail from different addresses, as well as checks and other items that had C.'s name on them. There was also a methamphetamine or marijuana pipe, a wallet with a social security card belonging to "Kevin Medina," and a possible bullet.

---

[2] The car had been reported stolen, and when the registered owner had reported the theft, she said that she suspected that her ex-boyfriend, Medina-Lopez, had taken the car.

Surveillance videos showed that the Nissan was parked in the area the evening of Medina-Lopez's murder, and the next day, someone driving a Chevy Impala dropped off the man that was seen standing next to the Nissan before it burned.

On July 9, 2020, Amaral was interviewed by police. He acknowledged he was a Sureño and had a tattoo that said "VGS" on his stomach.

On July 22, 2020, officers searched the residence of one of Medina-Lopez's known associates. During the search, the associate arrived driving a Chevy Impala that appeared to be the same car seen on the surveillance videos near the car fire in Scotts Valley. The associate's son recalled that his father woke him up one morning after getting a call from Amaral. The same morning, his father drove him to Santa Cruz, and, on the way, stopped the car and threw pieces of a gun out into the forest.

At trial, Amaral's girlfriend recounted that she had heard a rumor about Medina-Lopez being involved in some sort of sexual assault. Amaral's girlfriend had previously told her sister that Medina-Lopez was killed because he had raped someone.

### 3. *Gang Expert Testimony*

San Jose Police Department Officer Stephen Fries testified as an expert in criminal street gangs. Fries was familiar with the Kollmar Varrios Trece (KVT) Sureño subset. Fries opined that it was consistent for a KVT gang member to have a tattoo that says "VGS," short for "vagos," on their person. Active Sureño gang members that are found to have violated the gang's bylaws or rules are subject to discipline. One bylaw passed down from the Mexican Mafia and likely passed down to Sureño subsets is that gang members' girlfriends and wives are to be treated with respect, and violation of that bylaw can result in a gang member's death.

## C. *Verdict and Sentencing*

The jury convicted Amaral of all charged counts and found true the allegations that he personally and intentionally discharged a firearm causing great bodily injury

5

(§ 12022.53, subd. (d); counts 1 and 2) and personally used a firearm (§ 12022.53, subd. (b); count 3). After a separate court trial, the court found true one of the prior strike allegations and noted that the prosecutor had moved to dismiss the second prior strike allegation.

On October 15, 2021, the trial court sentenced Amaral to a term of 50 years to life for murder (§ 187, subd. (a); count 1), life for attempted willful, deliberate, premeditated murder (§§ 664, 187, subd. (a); count 2), 14 years for attempted murder (§§ 664, 187, subd. (a); count 3); and three years and four months for carjacking (§ 215, subd. (a); count 4). The trial court also imposed terms of 25 years to life and 10 years, respectively, for the firearm allegations (§§ 12022.53, subd. (d)) as to counts 1 and 2, and imposed and stayed under section 654 two four-year terms for possession of a firearm by a felon (§ 29800, subd. (a)(1); count 5) and possession of ammunition by a prohibited person (§ 30305, subd. (a)(1); count 6). The trial court struck the remaining prior serious felony conviction allegation under section 667, subdivision (a).[3] In total, Amaral was sentenced to an indeterminate sentence of 100 years to life and a determinate sentence of 27 years 4 months.

## II.    DISCUSSION

### A.    *Admission of Bloody Photographs*

Amaral argues that the trial court erred when it admitted two bloody photographs that depicted T.'s injuries the night of the murder. He argues that the blood obscured T.'s injuries, which misled the jury about the severity of her wounds, and that the photographs were more prejudicial than probative under Evidence Code section 352. He argues that the allegation that Amaral personally discharged a firearm causing great bodily injury

---

[3]Although the record is silent on this point, we note that it appears that a conviction for section 245, subdivision (a)(4), assault by means of force likely to produce great bodily injury, does not qualify as a serious felony conviction under section 667, subdivision (a). (See § 1192.7, subd. (c) [definition of a "serious felony"].)

6

should therefore be reversed.  We discern no abuse of discretion in the trial court's admission of the photographs.

### 1.    *Background*

Five photographs of T.'s injuries were admitted into evidence at trial.  Three of the photographs were stills from a video of T.'s interview with the police taken 10 days after the murder.  The officer who conducted the interview testified that he thought that T.'s injury on her hand was more serious than the one on her face, and her hand appeared discolored and swollen.

The remaining two photographs were taken by one of T.'s friends on the night of the shootings.  These photographs showed T.'s bloodied hand and face.  When the prosecutor introduced these two photographs at trial, defense counsel objected, arguing that the "bloody" nature of the photographs rendered them more prejudicial than probative.  Defense counsel also argued that the photographs were unnecessary because of the "extensive amount of blood" on T.'s face and hands, and T. could have described her injuries in lieu of the photographs.  The trial court overruled the objection after concluding that the photographs, though bloody, showed T.'s condition at the time.  The trial court also noted that the earlier testimony had "minimize[d] the injuries" and that the photographs were "quite probative."

### 2.    *Legal Principles*

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  " '[P]rejudicial' " as used in Evidence Code section 352 "is not synonymous with 'damaging,' but refers instead to evidence that ' "uniquely tends to evoke an emotional bias against defendant" '

without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)

On appeal, we review the trial court's decision on the admissibility of evidence under Evidence Code section 352 for an abuse of discretion. (*People v. Gonzalez* (2021) 12 Cal.5th 367, 408.)

### 3.    *Analysis*

Having reviewed the challenged photographs, we conclude that the trial court did not abuse its discretion by admitting them. The photographs were probative because they corroborated the testimony given by T. and other witnesses about her injuries. That the photographs were arguably duplicative of T.'s testimony does not require their exclusion. "[P]rosecutors . . . are not obliged to prove their case with evidence solely from live witnesses." (*People v. Gurule* (2002) 28 Cal.4th 557, 624 (*Gurule*).)

Moreover, the trial court was entitled to reject Amaral's assertion that the photographs were merely cumulative of the three video stills. *People v. Gibson* (1976) 56 Cal.App.3d 119, upon which Amaral relies, is distinguishable. In *Gibson*, two photographs of the deceased victim were "gruesome, revolting, and shocking to ordinary sensibilities" and were only "of slight relevancy" given the admission of "many other photographs of the deceased victim." (*Id.* at p. 135.) Unlike in *Gibson*, the prosecutor here offered only five photographs depicting T.'s injuries, and the two challenged photographs were the only ones showing T.'s condition the night of the crime. The video stills from T.'s interview appear to be of poor resolution and showed the injuries from a distance, 10 days into the healing process. The two photographs at issue were more than merely cumulative.

We likewise have no basis to question the trial court's evaluation of the images' prejudicial effect. "[V]ictim photographs and other graphic items of evidence in murder cases always are disturbing." (*People v. Heard* (2003) 31 Cal.4th 946, 976 (*Heard*).)

8

"[T]hat they are graphic and unpleasant to consider does not render the introduction of those images unduly prejudicial." (*Ibid.*) The photographs depicted blood but were not otherwise gory or of a type likely to "inflame a jury." (*Id.* at p. 977 [photographs of murder victim's head laceration, deep enough to expose her skull, and of a footprint on her chest were not unduly prejudicial]; *Gurule*, *supra*, 28 Cal.4th at pp. 625-626 [autopsy photographs were not unduly prejudicial].) That T. was able to appear before the jury—alive, intact, and physically healed—further mitigates the risk of undue prejudice.

Nor were the photographs misleading in context; the photographs merely "illustrated the brutal nature of the attack" upon T. (*Heard*, *supra*, 31 Cal.4th at p, 976.) Although Amaral argues that the amount of blood obscured the actual injuries themselves, any difficulty in identifying the scope or contours of the actual entry wounds did not negate the photographs' probative value. We cannot say it was unreasonable for the trial court to impliedly find the amount of blood to be relevant to the jury's consideration of the allegation under section 12022.53 that Amaral, by personally discharging a firearm, had inflicted great bodily injury. Moreover, the trial court could reasonably have found that the photograph of T.'s hand, though dark in places, appears to show the entry wound that was the source of the blood, as well as swelling that could be viewed as corroborative of the interviewing officer's description of detail not visible in the video stills. And to the extent that portions of T.'s injuries were obscured by blood, the previously admitted video stills showed the wounds days later, allowing the jury to draw reasonable inferences as to the seriousness of the injuries, anchored by both sets of photographs.

A trial court's ruling under Evidence Code section 352 will be upheld "unless [the court] exercised its discretion in an arbitrary, capricious, or patently absurd manner." (*People v. Thomas* (2012) 53 Cal.4th 771, 809.) Given the probative nature of the

9

evidence, weighed against its potential for undue prejudice, we find no abuse of discretion in the trial court's admission of the two photographs.

Furthermore, even assuming that the photographs were improperly admitted under Evidence Code section 352, Amaral's emphasis on their purportedly cumulative probative value prevents him from demonstrating prejudicial error. (See *People v. Marks* (2003) 31 Cal.4th 197, 227 [applying " 'reasonable probability' standard" of *People v. Watson (*1956) 46 Cal.2d 818, 836 to error under Evid. Code, § 352].) Even without the two photographs, there was ample evidence that Amaral inflicted great bodily injury on T., which is defined as "significant or substantial physical injury." (§§ 12022.7, subd. (f), 12022.53, subd. (d).) T. testified that she lost consciousness twice after she was shot, her injuries caused her a significant amount of pain, and her friend wanted to drive her to the hospital. C. testified that after the shooting, she applied pressure to stanch the flow of blood from T.'s facial wound, while T. had something that looked like a bullet stuck in her hand. The officer who interviewed T. 10 days later described the wound on T.'s hand as swollen, discolored, and dark. And as Amaral himself points out, multiple witnesses testified that they saw blood on T.'s person, although they were unable to see any specific injuries. Given the evidence, even if it was error to admit the photographs in question, it is not reasonably probable that the jury would in their absence have entertained a reasonable doubt as to the great bodily injury enhancement. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Because we discern no merit in Amaral's claim that the admission of the photographs violated Evidence Code section 352 or that they had any impermissible prejudicial effect, we likewise have no basis to conclude their admission violated his right to due process. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) Our conclusion as to the trial court's balancing of

10

probative value and undue prejudice under state law forecloses a finding of fundamental unfairness.

**B.    *Section 654***

Because Amaral's killing of Medina-Lopez and driving off in Medina-Lopez's car were united by a common objective, we accept as well-founded the Attorney General's concession that the trial court erred under section 654 when it imposed sentences for both the murder and carjacking convictions.[4]

Section 654, subdivision (a) prohibits multiple punishments for "[a]n act or omission that is punishable in different ways by different provisions of the law." An " 'act or omission' " within the meaning of section 654 includes "a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Capistrano* (2014) 59 Cal.4th 830, 885, overruled on a different point as stated in *People v. Hardy* (2018) 5 Cal.5th 56, 104.) We review a trial court's determination that two crimes were separate, involving separate objectives for substantial evidence. (*People v. Brents* (2012) 53 Cal.4th 599, 618.)

Here, the parties do not dispute that the carjacking and murder comprised an indivisible course of conduct.[5] In this case, the prosecution's theory for the carjacking,

---

[4] Although Amaral did not object to the imposition of multiple sentences below, "a section 654 claim is not waived by failing to object below." (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

[5] Section 187, subdivision (a) defines murder as "the unlawful killing of a human being . . . with malice aforethought." Section 215, subdivision (a) defines carjacking as the "felonious taking of a motor vehicle in the possession of another, from his or her person or immediate presence, or from the person or immediate presence of a passenger of the motor vehicle, against his or her will, with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear."

11

which was supported by the evidence at trial, was that the carjacking and the murder involved the same forcible act —Amaral's shooting of Medina-Lopez. There is no evidence that Amaral's objective in taking the car was independent of the murder, rather than merely incidental to the murder as a means of effectuating his flight from the crime scene. To the contrary, Amaral's torching of the car undermined any inference of an independent or pecuniary motive.

Absent any evidence suggesting a separate intent or objective, we conclude the trial court's implied determination that the carjacking and murder constituted a divisible course of conduct lacks substantial evidence. (See *People v. Nunez* (2012) 210 Cal.App.4th 625, 628-630 [assault was incidental to carjacking as there was no evidence the assault was a gratuitous act of violence or motivated by an animus unrelated to the taking of the vehicle]; *People v. Lowe* (1975) 45 Cal.App.3d 792, 795 [robbery and murder that share same objective of robbery falls within purview of section 654's prohibition against multiple punishment]; *In re McCoy* (1968) 266 Cal.App.2d 739, 740 [defendant could not be punished for both robbery and escape when robbery was "part of and intended to consummate a plan of escape"]; *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 [defendant could not be punished for both kidnapping and rape when "the evidence [did] not suggest any intent or objective behind the kidnapping other than to facilitate the rapes"].) The imposition of multiple sentences for both counts thus violated section 654.

As the Attorney General observes, we must accordingly remand the matter for a full resentencing so that the trial court may reconsider the entire sentencing scheme. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; *People v. Burns* (1984) 158 Cal.App.3d 1178, 1183 [if staying a consecutive sentence results in a "direct and calculable" decrease in the sentence, remand for resentencing

12

should be ordered].)  We appreciate the Attorney General's forthright support of remand, particularly in view of the position taken by Amaral in reply.

Amaral argues that remand is not required because staying the consecutive sentence imposed for carjacking would result in only a minimal adjustment to his sentence—he was sentenced to a term of three years and four months for the carjacking, but his total sentence was 100 years to life plus a determinate term of 27 years 4 months. Although we express no opinion on the appropriate or likely sentence on remand, Amaral's assumption that the trial court would necessarily elect to stay the sentence imposed for carjacking does not account for recent ameliorative amendments to section 654.  At the time that Amaral was sentenced, former section 654, subdivision (a) provided in pertinent part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  Effective January 1, 2022, section 654 was amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441, § 1), which no longer requires that the trial court impose the longest prison term.  As nothing in Assembly Bill No. 518 indicates that the Legislature intended these legislative changes to apply prospectively, the amendments apply retroactively to all nonfinal judgments. (*People v. Sek* (2022) 74 Cal.App.5th 657, 673.)  Amaral's case is not yet final, rendering the amendments to section 654 retroactive to his case.  And under the new version of section 654, the trial court would be permitted to sentence Amaral as to either carjacking *or* murder and stay the sentence on the other count.  We are unable to presume that a trial court—given discretion it lacked at the original sentencing—would decline to give due consideration to potential factors in mitigation, if any, that Amaral in his original

13

sentencing may have had no meaningful incentive to present. Nothing at Amaral's very abbreviated sentencing hearing compels a different conclusion.[6]

Accordingly, we conclude that a full resentencing is required in this case. On remand, the trial court will be required to apply the current law, which includes the newly amended version of section 654.

## C.   *Correction to the Abstract of Judgment*

Finally, both parties agree that the abstract of judgment does not accurately reflect that the trial court stayed the sentences for counts 5 and 6 under section 654. We agree that the abstract of judgment presently contains a clerical error. Nonetheless, as we are remanding the matter for a full resentencing, a correction of the abstract of judgment is premature and unnecessary. On remand, the trial court will be entitled to reconsider all its sentencing decisions—including whether to stay the sentences under counts 5 and 6 under section 654 as it originally intended or, under the newly amended version of section 654 that is now in effect, stay the sentences imposed for Amaral's other convictions given its newfound discretion.

## III.   DISPOSITION

The judgment is reversed and remanded for resentencing. At resentencing, the trial court may not impose multiple punishments for Amaral's conviction of murder and carjacking. Following resentencing, the clerk of the court shall prepare an amended abstract of judgment and forward a copy to the Department of Corrections and Rehabilitation.

---

[6] After Medina-Lopez's father made a point of expressing his forgiveness of Amaral and his compassion for Amaral's family, the trial court addressed Amaral at some length, ultimately concluding: "There's more to you than what I normally see in people given crimes like this. You're deeper than that. I see something in you that tells me you can help others. Hopefully you see the same thing in yourself."

14

_____

LIE, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

GROVER, J.

*People v. Amaral*
H049476

15